UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| UNITED SERVICES AUTOMOBILE ASSOCIATION; USAA GENERAL INDEMNITY COMPANY; and USAA CASUALTY INSURANCE COMPANY, | C.A. No. _____ |
| Plaintiffs, | |
| v. | **Demand for Jury Trial** |
| LEVEL 1 HEALTH SYSTEMS OF MICHIGAN, LLC d/b/a LEVEL 1 PHYSICAL THERAPY; MICHIGAN FIRST REHAB, LLC; SELECT MEDICAL GROUP OF MICHIGAN PLLC D/B/A SELECT MEDICAL GROUP OF MICHIGAN, PLLC; DEHKO INVESTMENT, INC. d/b/a RENT A RIDE OF DETROIT; SOMERSET AUTO BODY OF MI, INC. d/b/a SOMERSET AUTO, SOMERSET AUTO CENTER, SOMERSET COLLISION, AND 1800PAIN800; LINCOLN INTERNATIONAL LLC/1-800-PAIN-800; NORMAN DEHKO; SABAH DEHKO; JORDAN DEHKO; and PEDRO TOWEH, M.D., | |
| Defendants. | |

## COMPLAINT

Plaintiffs United Services Automobile Association, USAA General Indemnity Company, and USAA Casualty Insurance Company (collectively, "Plaintiffs") hereby allege as follows.

## I.   INTRODUCTION

1.     This case involves the Dehko family (i.e., Norman Dehko, Sabah Dehko, and Jordan Dehko), who engaged in a scheme to defraud the Plaintiffs by submitting, and causing to be submitted, false medical records and bills (hereinafter, "false medical documentation") through the U.S. Mail seeking payment under the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., for tests, treatment, and services that (1) were not actually rendered, (2) were medically unnecessary, (3) were fraudulently billed, and (4) were not lawfully rendered.

2.     The Defendants Level 1 Health Systems of Michigan, LLC d/b/a Level 1 Physical Therapy ("Level 1 Physical Therapy"), Michigan First Rehab, LLC ("Michigan First Rehab"), Select Medical Group of Michigan PLLC d/b/a Select Medical Group of Michigan, PLLC ("Select Medical Group"), Dehko Investment, Inc. d/b/a Rent A Ride of Detroit ("Rent A Ride") (collectively, the "Provider Defendants"), Somerset Auto Body of MI, Inc. d/b/a Somerset Auto, Somerset Auto Center, Somerset Collision, and 1800PAIN800 ("Somerset Auto"), Lincoln International LLC/1-800-PAIN-800 ("1-800-PAIN"), Norman Dehko, Sabah

2

Dehko, Jordan Dehko, sand Pedro Toweh, M.D. ("Toweh") (collectively referred to as the "Defendants") damaged the Plaintiffs by collecting payments from the Plaintiffs based upon an insurance billing fraud scheme in violation of state and federal law.

3.     The Defendants' scheme to defraud was generated through the unlawful solicitation of automobile accident victims that were integral to the Defendants' plan to exploit Michigan's No-Fault laws, which resulted in the Plaintiffs making payments to the Defendants.

4.     As detailed below, the success of this scheme relied on a large base of patients who were eligible to seek benefits under Michigan's No-Fault laws.

5.     At all relevant times, the Provider Defendants were used as vehicles to bill for an array of tests, treatment, and services that were (1) not rendered; (2) medically unnecessary and pursuant to a predetermined treatment protocol; (3) fraudulently billed; and/or (4) not lawfully rendered.

6.     The Dehkos' position of control allowed them to (a) direct patient care; (b) ensure the delivery of an excessive amount of tests, treatment, and services by the Provider Defendants; and (c) drive the unlawful referral of patients to other providers that were under their ownership and control.

7.     The Provider Defendants, despite billing by distinct legal entities owned by separate individuals, are all unlawfully operated by the Dehko's to extract No-Fault insurance proceeds from the Plaintiffs and other insurance companies.

8.     The Defendants' scheme relied on the transmission to the Plaintiffs, through the U.S. Mail, of false medical documentation demanding No-Fault benefits under Michigan law.

9.     The Plaintiffs reasonably relied on the facial validity of the records and bills mailed by the Provider Defendants when making No-Fault benefit payments to the Provider Defendants.

10.    These No-Fault benefit claim submissions were false and fraudulent because the records and bills contained material misrepresentations.

11.    The Plaintiffs estimate that the Defendants intentionally submitted hundreds of bills on behalf of the Provider Defendants knowing that none of the bills were lawfully compensable under prevailing Michigan No-Fault insurance laws.

12.    All of the acts and omissions of the Defendants, described throughout this Complaint, were undertaken intentionally.

13.    By this Complaint, the Plaintiffs bring this action for: (1) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c) and (d); (2) common law fraud; (3) civil conspiracy; (4) payment under mistake of fact; and (5) unjust enrichment.

4

14.     The Plaintiffs also seek a declaration pursuant to 28 U.S.C. § 2201 that they are not obligated to pay more than $2,387,848.11 in No-Fault insurance claims that have been submitted by or on behalf of the Provider Defendants to the Plaintiffs because the Provider Defendants submitted fraudulent billing for tests, treatment, and services.

15.     This action seeks actual damages of more than $827,439.18, which represents No-Fault benefit payments that the Plaintiffs were fraudulently induced to pay to the Provider Defendants.

## II.    **PARTIES**

### A.    **PLAINTIFFS**

16.     United Services Automobile Association, USAA General Indemnity Company, and USAA Casualty Insurance Company are duly organized and existing under the laws of the State of Texas, and each have their respective principal places of business at 9800 Fredericksburg Road, San Antonio, Texas.

17.     United Services Automobile Association, USAA General Indemnity Company, and USAA Casualty Insurance Company are authorized to conduct business in the State of Michigan.

B.     **DEFENDANTS**

1.     **Level 1 Health Systems of Michigan, LLC**

18.     Level 1 Health Systems of Michigan, LLC is organized under the laws of the State of Michigan.

19.     Level 1 Health Systems of Michigan, LLC also does business using the registered fictitious name Level 1 Physical Therapy.

20.     Level 1 Physical Therapy's principal place of business is located in Huntington Woods, Michigan.

21.     Level 1 Physical Therapy is owned and controlled by the Defendant, Sabah Dehko, and Sabah Dehko is responsible for all actions of Level 1 Physical Therapy described throughout this Complaint.

22.     Defendants, Select Medical Group, Toweh, Norman Dehko, Rent A Ride, Somerset Auto, and 1-800-Pain also participated in the control and operation of Level 1 Physical Therapy.

23.     Level 1 Physical Therapy billed the Plaintiffs for physical therapy treatment that was not actually rendered, was medically unnecessary (to the extent treatment was rendered at all), was fraudulently billed, and was unlawful in relation to the Plaintiffs' claimants, including the patients set out in Exhibit 1.

## 2.   Michigan First Rehab, LLC

24.    Michigan First Rehab, LLC is organized under the laws of the State of Michigan.

25.    Michigan First Rehab's principal place of business is located in Oak Park, Michigan.

26.    Michigan First Rehab is owned and controlled by the Defendant, Jordan Dehko, and Jordan Dehko is responsible for all actions of Michigan First Rehab described throughout this Complaint.

27.    Defendants, Select Medical Group, Toweh, Norman Dehko, Rent A Ride, Somerset Auto, and 1-800-Pain also participated in the control and operation of Michigan First.

28.    Michigan First Rehab billed the Plaintiffs for physical therapy treatment that was not actually rendered, was medically unnecessary (to the extent treatment was rendered at all), was fraudulently billed, and was unlawful in relation to the Plaintiffs' claimants, including the patients set out in Exhibit 2.

## 3.   Select Medical Group of Michigan PLLC d/b/a Select Medical Group of Michigan, PLLC

29.    Select Medical Group of Michigan PLLC d/b/a Select Medical Group of Michigan, PLLC is organized under the laws of the State of Michigan.

30.     Select Medical Group's principal place of business is located in Oak Park, Michigan.

31.     Select Medical Group is owned and controlled by the Defendant, Toweh, and Toweh is responsible for all actions of Select Medical Group described throughout this Complaint.

32.     Defendants, Level 1 Physical Therapy, Sabah Dehko, Michigan First Rehab, Jordan Dehko, Norman Dehko, Rent A Ride, Somerset Auto, and 1-800-PAIN, also participated in the control and operation of Select Medical Group.

33.     Select Medical Group billed the Plaintiffs for medical tests, treatment, and services that were not actually rendered, were medically unnecessary (to the extent treatment was rendered at all), were fraudulently billed, and were unlawful in relation to the Plaintiffs' claimants, including the patients set out in Exhibit 3.

### 4.    **Dehko Investment, Inc.**

34.     Dehko Investment, Inc. is incorporated under the laws of the State of Michigan.

35.     Dehko Investment, Inc. also does business using the registered fictitious name Rent A Ride of Detroit.

36.     Rent A Ride's principal place of business is located in Huntington Woods, Michigan.

37.     Rent A Ride is owned and controlled by the Defendant, Norman Dehko, and Norman Dehko is responsible for all actions of Rent A Ride described throughout this Complaint.

38.     Defendants, Level 1 Physical Therapy, Sabah Dehko, Michigan First Rehab, Jordan Dehko, Select Medical Group, Toweh, Somerset Auto, and 1-800-PAIN also participated in the control and operation of Rent A Ride.

39.     Rent A Ride billed the Plaintiffs for medical transportation services that were not actually provided, were medically unnecessary (to the extent they were provided at all), and were unlawful in relation to the Plaintiffs' claimants, including the patients set out in Exhibit 4.

**5.     Somerset Auto Body of MI, Inc.**

40.     Somerset Auto Body of MI, Inc. is incorporated under the laws of the State of Michigan.

41.     Somerset Auto Body of MI, Inc. also does business using the registered fictitious names Somerset Auto, Somerset Auto Center, Somerset Collision, and 1800PAIN800.

42.     Somerset Auto's principal place of business is located in Highland Park, Michigan.

9

43.    Somerset Auto is owned and controlled by the Defendant, Norman Dehko, and Norman Dehko is responsible for all actions of Somerset Auto described throughout this Complaint.

44.    Somerset Auto illegally and improperly solicited and induced individuals to undergo unnecessary tests, treatment, and services (to the extent treatment was provided at all) billed to the Plaintiffs by the Defendants.

### 6.    Lincoln International LLC/1-800-PAIN-800

45.    Lincoln International LLC/1-800-PAIN-800 is organized under the laws of the State of Michigan.

46.    1-800-PAIN's principal place of business is located in Huntington Woods, Michigan.

47.    1-800-PAIN is owned and controlled by the Defendant, Norman Dehko, and Norman Dehko is responsible for all actions of 1-800-PAIN described throughout this Complaint.

48.    1-800-PAIN illegally and improperly solicited and induced individuals to undergo unnecessary tests, treatment, and services (to the extent treatment was provided at all) billed to the Plaintiffs by the Defendants.

### 7.    Norman Dehko

49.    Norman Dehko is a resident and citizen of the State of Michigan.

50.    Norman Dehko owns Rent A Ride.

10

51.     Norman Dehko owns Somerset Auto.

52.     Norman Dehko owns 1-800-Pain.

53.     At all relevant times to this Complaint, Norman Dehko operated and controlled Level 1 Physical Therapy, Michigan First Rehab, Select Medical Group, and Rent A Ride by using the Provider Defendants to bill for tests, treatment, and services that were (1) not rendered; (2) medically unnecessary and pursuant to a predetermined treatment protocol; (3) fraudulently billed; and/or (4) not lawfully rendered.

54.     Because he directly participated in the operation and management of Level 1 Physical Therapy, Michigan First Rehab, Select Medical Group, and Rent A Ride enterprises during the course of the scheme, Norman Dehko is responsible for the fraudulent billing and is also jointly and severally liable for the payments that the Plaintiffs were fraudulently induced to pay to the Provider Defendants.

55.     Norman Dehko has an extensive history of insurance fraud schemes conducted in the State of Michigan. *See infra* at Section IV.

56.     Norman Dehko does not possess any license in any healthcare field.

**8.     Sabah Dehko**

57.     Sabah Dehko is a resident and citizen of the State of Michigan.

58.     Sabah Dehko owns Defendant Level 1 Physical Therapy.

11

59.     At all relevant times, Sabah Dehko operated and controlled Select Medical Group and Rent A Ride.

60.     Because he directly participated in the operation and management of Level 1 Physical Therapy, Select Medical Group, and Rent A Ride during the course of the scheme, Sabah Dehko is responsible for the fraudulent billing and is also jointly and severally liable for the payments that the Plaintiffs were fraudulently induced to pay to the Provider Defendants.

61.     Sabah Dehko does not possess any license in any healthcare field.

### 9.     Jordan Dehko

62.     Jordan Dehko is a resident and citizen of the State of Michigan.

63.     Jordan Dehko owns Defendant Michigan First Rehab.

64.     At all relevant times, Jordan Dehko operated and controlled Select Medical Group and Rent A Ride.

65.     Because he directly participated in the operation and management of Michigan First Rehab, Select Medical Group, and Rent A Ride during the course of the scheme, Jordan Dehko is responsible for the fraudulent billing and is also jointly and severally liable for the payments that the Plaintiffs were fraudulently induced to pay to the Provider Defendants.

66.     Jordan Dehko does not possess any license in any healthcare field.

### 10.   **Pedro Toweh, M.D.**

67.     Toweh is a resident and citizen of the State of Michigan.

68.     Toweh owns the Defendant Select Medical Group.

69.     At all relevant times, Toweh operated and controlled Level 1 Physical Therapy, Michigan First Rehab, and Rent A Ride.

70.     Because he directly participated in the operation and management of Select Medical Group, Level 1 Physical Therapy, Michigan First Rehab, and Rent A Ride during the course of the scheme, Toweh is responsible for the fraudulent billing and is also jointly and severally liable for the payments that the Plaintiffs were fraudulently induced to pay to the Provider Defendants.

## III.   **JURISDICTION AND VENUE**

71.     Subject matter jurisdiction over this action is conferred upon this court by 28 U.S.C. § 1331 relating to the claims brought by the Plaintiffs under 18 U.S.C. § 1961 *et seq*. because they arise under the laws of the United States.

72.     Supplemental jurisdiction over the Plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

73.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) whereas the vast majority of the acts at issue in this Complaint were carried out within the Eastern District of Michigan.

74.     At all relevant times, the Defendants have engaged in purposeful activities in Michigan by seeking and submitting payment demands for claims made under Michigan No-Fault laws.

75.     The Defendants' activities in and contacts with Michigan were purposely sought and transacted to take advantage of the benefits available under Michigan's No-Fault laws.

76.     As the allegations in the within Complaint arise from the Defendants' fraudulent demands for payment under the No-Fault laws of Michigan, there is no question that there existed a substantial relationship between the transactions at issue and the Plaintiffs' causes of action.

## IV.   PRIOR LITIGATION INVOLVING THE DEFENDANTS

### A.   Criminal

77.     Norman Dehko has a history of defrauding insurance companies in the State of Michigan.

78.     In 2007, Norman Dehko, was charged with forty-four (44) felonies, including racketeering, insurance fraud, and forgery, in connection with a scheme that involved falsification of collision reports and enhancing collision damage through Somerset Auto.

79.    On January 24, 2012, Norman Dehko pled guilty to three (3) counts of insurance fraud and conspiracy and was consequentially sentenced to seven (7) months imprisonment with five (5) years of probation.

80.    In 2014, Somerset Auto, was raided by both state and federal agencies in connection with an insurance fraud scheme wherein corrupt members of the Detroit Police Department were recruited to steer accident victims to Norman Dehko and Somerset Auto in exchange for a kickback.

81.    True and accurate excerpts from United States of America Circuit Court Judge Eric Murphy's public, written opinion are depicted below.

> While on probation, Dehko continued in his old insurance-fraud ways. The police learned of his new round of misconduct. In February 2014, they obtained a search warrant to perform what Dehko later called a "raid" of Somerset.
>
> This time, Dehko cooperated. He identified several officers in the Detroit Police Department's "abandoned vehicle task force" who were involved in his crimes. When officers in this task force came across a towable vehicle, department policy required them to arrange for the tow through a central dispatch. Yet rogue officers would quickly call Dehko and let him know that they had a vehicle for him. They would arrange for a tow directly to Somerset and attempt to convince the vehicle's owner to use this body shop. The officers might also file false police reports listing fake damage on the vehicle to facilitate the insurance fraud. Dehko paid officers about $1,000 for each referral and an extra $500 for a false police report.

***

15

> A few months after this search, Dehko became a confidential FBI source. He agreed to continue accepting referrals from the six to eight suspected task-force officers. Now, however, the FBI would provide the funds for his bribes. The FBI also asked Dehko to secretly record his conversations with these officers.

*See United States of America v. Deonne Dotson*, United States Court of Appeals for the Sixth Circuit, No. 21-2826.

82.    Norman Dehko also conspired with a former Detroit police officer, who was convicted for falsifying police reports. *See State of Michigan v. Schuh*, No. 08-013141-FH, Wayne Circuit Court.

83.    Trial testimony from two FBI special agents provided the following relevant details of their interview with the former police officer, Kevin Schuh.

> We started by informing him that we had reviewed these reports and that there were activity logs that showed him at one part of the city and at the same time he would file an accident report showing him in another part of the city and we had a dialogue and we agreed that you couldn't be in two places at one time so we asked him if he could explain that to us, which he did.
>
> * * *
>
> [Defendant] identified Norman Dehko as the owner of Somerset Collision, a person that he had written some reports for.
>
> * * *

. . . We asked him how—what were the circumstances when he made those reports cause the reports clearly could not have been taken at the scene as they were written up because he was at another point in the city doing other enforcement activities or other police calls that were verified.

So he said that he had been provided information by these shop owners; that they would ask him to complete an accident report for them and that he would put the information he had been provided by the shop owners into the report and file it.

\* \* \*

He told us he had done it approximately 15 times.

\* \* \*

He agreed that he had not been at the scene where the crash was reported at the time of the crash and he also told us that the information that had been input into the actual report was that which had been provided by the collision shop owners.[2]

* * *

We asked [defendant] [if he received anything in exchange for preparing the requested accident reports]. He said he had never received anything per report, but he admitted that he had received between five and seven thousand dollars from loans from these collision shop owners over a period of time and that these loans had no payback arrangement and that I don't believe, to the best of my recollection, any payment had ever been made, any restitution was ever made.

* * *

. . . We asked in talking with him, we said, you do understand the value that a collision shop owner would have to having a police officer sign a report saying that he was at the scene? It would give it a certain credibility in the eyes of an insurance agent or somebody else if a police officer had been to the scene, had recorded this accident and had somewhat observed the vehicles at that place.

* * *

[Defendant's answer] was, yes, he understood that there would be a value to that.

**B.    Civil**

84.    In addition to the criminal cases discussed herein, the Defendants have been named in multiple civil cases accusing them of insurance fraud.

85.    On October 15, 2020, the Defendants Norman Dehko, Sabah Dehko, Jordan Dehko, Level 1 Physical Therapy, Michigan First Rehab, Select Medical

Group, Rent A Ride, Somerset Auto, and 1-800-PAIN were named as Defendants in the matter *Allstate Insurance Company v. Kinetix Rehab Services Inc.*, United States District Court for the Eastern District of Michigan, Civil Docket No.: 2:20-cv-12783-BAF-DRG (the "Allstate Suit").

86.     According to the Allstate Suit, Norman Dehko, his family, and his associates unlawfully induced motor vehicle accident victims to seek treatment at clinics that were owned and controlled by the Defendants, including Select Medical Group, where they were invariably placed on a medically unnecessary predetermined treatment protocol that included physical therapy referrals to facilities such as Level 1 Physical Therapy and Michigan First Rehab.

87.     True and accurate excerpts from the Allstate Suit are depicted below.

117. Numerous patients have testified that they received unprompted calls from 1-800-PAIN within days of their motor vehicle accidents offering "free" transportation to AMC.

118. Email records document hundreds of exchanges between Norman Dehko, AMC, the "Level 1" clinics, and individual physicians employed by the defendants.

119. The defendants' bank records also reveal an extensive network of payments between the defendants and their associates that are evidence of the *quid pro quo* arrangements they used to generate patient referrals.

120. For example, Somerset Auto and Level 1 Health exchanged more than $100,000 in checks between June 2016 through February 2018, many of which included a memo specifying the payment is for "marketing and advertising."

121. The defendants used references to "marketing," "advertising," and "transportation" to conceal the true nature of the cash transactions that drove the scheme described herein.

122. Somerset Auto also wrote checks to 1-800-PAIN for "advertising."

***

138.   Angelo also exercised control over the solicitation and referral of patients to the Defendant Entities, which is evidenced by hundreds of emails he exchanged with Norman Dehko, AMC, and AMC's physicians beginning in 2018.

139.   These email communications also confirm the layperson control over patient evaluation and treatment and the method by which patients were divvied up between Dehko and the defendants herein, Angelo and his clinics, and other associates.

140.   For example, in one such communication copied below, layperson Angelo informed defendants Hassan and Norman Dehko that he "can refer lots of patients for spinal injections," despite having absolutely no background or training that would qualify him to determine that invasive procedures were medically necessary:

| | |
|---|---|
| **From:** | Michael Angelo [+19732704708] |
| **Sent:** | 12/17/2018 1:47:25 PM |
| **To:** | Lukasz Wietrzynski P77039 [+15862169444]; Najam Hassan [+13137790091]; Norman Dehko [+12488827000] |
| **Subject:** | No Subject |

Maxim says about leasing ur place
What is happening to James Reese  it he is staying I can refer lots of patients for spinal injections
I mean Nazem leased from u

141.   The defendants' bank records also confirm their payments to tow truck drivers in exchange for patient solicitation.

142.   One tow truck driver who received numerous payments from Somerset Auto confirmed to Allstate that he (a layperson) talked about going to physical therapy with people he picked up at accident scenes.

143.   This tow truck driver reported that he only referred these individuals to auto body shops instead of directly to providers because the auto body shops like Somerset Auto have physical therapy referrals "on lock."

88.   On February 1, 2022, Level 1 Physical Therapy, Michigan First Rehab, and Jordan Dehko were named as Defendants in the matter *Lint Chiropractic, P.C. v. Level One Health Systems of Michigan, LLC*, Circuit Court for the County of Oakland, Case No.: 2022-192340-CZ, wherein Lint Chiropractic, P.C. sought to recover medical equipment (i.e., Nervomatrix machines) that had been placed in Level 1 Physical Therapy and Michigan First Rehab on a trial basis.

89.   A true and accurate excerpt from the aforementioned Complaint is depicted below.

6. That on or about May of 2021 Plaintiff did place certain Lint devices at the Defendant facilities to determine on a trial basis whether this was a sound investment opportunity and able to generate sufficient revenue to warrant continued placement.

7. That during the pendency of the placement, Plaintiff on numerous occasions approached the Defendant's with a request that they enter into and execute an independent subcontractor agreement and separate lease agreement with respect to the lint machines here at issues

8. That Plaintiff enjoyed exclusive rights to the machine as evidence by the attached lease agreement which was further identifies that each lint machine is valued at approximately $1 million. See **Exhibit A.**

9. That during the course of dealings by and in-between Plaintiff and Defendants, plaintiff's principals became aware of indictments that were filed against Defendant's and they might be operating illegally and billing illegally with the machines being places on the premises.

10. That in furtherance of concerns, Plaintiff sent to each facility their in-house chiropractor Corey Varawski to check on the machines; Mr. Varawski was denied access to see the machines and their placements.

11. That numerous text messages clearly demonstrate Plaintiff's attempts re-secure possession of the Lint machines which went both unanswered and became threatening from Defendants as the fact that they would destroy the property if they weren't paid money.

90.     The complaint further alleges that in a separate instance, Sabah Dehko locked the door with Robert Super, D.C. (the owner of Lint Chiropractic, P.C.) inside

and threatened physical violence against him, at which time law enforcement was again summoned.

91.    On July 14, 2023, a second lawsuit was filed by Lint Chiropractic, P.C. and Robert Super, D.C., in which Toweh, Norman Dehko, Sabah Dehko, Jordan Dehko, 1-800-PAIN, Rent A Ride, Select Medical Group, Level 1 Physical Therapy, and Michigan First Rehab were also named as Defendants.  *See Lint Chiropractic, P.C. v. Pedro Toweh, M.D.*, Circuit Court for the County of Wayne, Case No.: 23-008974-CZ.

92.    True and accurate excerpts from the aforementioned Complaint are depicted below.

> 10.    On or about, March, 2021, Plaintiffs, who were seeking to establish auto related no-fault business relationships in the Metropolitan Detroit area, were introduced to Defendant Norman Dehko by defendant SAM. The Plaintiffs were advised by defendant SAM that Defendant NORMAN was a key

player in the Michigan auto no-fault community, with valuable relationships with medical providers, therapy clinics, and patient referrals by and through his company, 1-800-PAIN-800 (a/k/a defendant Lincoln International).

11.     At the time of the introduction to NORMAN, both defendants SAM and JORDAN had indicated that defendant NORMAN did not own, operate, maintain, manage or control either of their respective medical facilities: Level 1 Health Systems of Michigan, LLC or Michigan First Rehab, LLC.

12.     At the time the Plaintiffs were introduced to Defendant NORMAN, it was unknown to the Plaintiffs that numerous insurance carriers shared the well-founded belief that Defendant NORMAN'S 1-800-PAIN-800 was the referral arm of a coordinated network of providers known to solicit auto accident victims, pay illegal kickbacks to doctors, and commit insurance fraud **(Ex. A - Motion for Summary Disposition from insurer referencing Dehko's suspected fraud ring).**

\*\*\*

16.     During Lint's time at Level One and Michigan First, and upon information and belief, defendant Toweh was introduced to the Level One and Michigan First locations as a treating physician by defendant NORMAN.

17.     Defendant NORMAN made the introduction to defendant TOWEH and controlled that relationship. This relationship was essential to the success of his sons' businesses. This was due to the fact that in Michigan, physical therapy clinics cannot refer for physical therapy or Durable Medical Equipment (hereinafter "DME"). Thus, each patient referred by defendant NORMAN to defendants SAM and JORDAN needs both a physical therapy referral, and a separate referral for DME.

18.     Upon information and belief, defendant NORMAN owned, operated, maintained, managed and controlled several DME companies.

19.     Essentially, defendant NORMAN rented the license of defendant TOWEH as part of his elaborate scheme to maximize the treatment for accident victims referred to by his auto body shops and 1-800-PAIN-800 marketing campaign. This scheme is also known as "doc-in-a-box".

***

21.     One of the Doctors that was very much ingrained in Dehko's network was Defendant Dr. Pedro Toweh, who worked from the very building owned by Defendant Dehko, received numerous patients from Dehko's 1-800-PAIN-800 patient referral services, referred treating patients to Defendant Dehko's therapy clinic, and even employed Dehko's girlfriend and immediate family members.

22.     Without any of this being known, the Plaintiff LINT entered into a contractual relationship with Defendants Sambah Dehko, Jordan Dehko, and their respective business entities Level 1 Health Systems of Michigan, LLC., and Michigan First Rehab, LLC. The purpose of the Agreement with the Defendants and their business entities, was for plaintiff LINT to lease space at the respective offices for purposes of treating patients utilizing various diagnostic modalities.

23.     Upon information and belief, Defendant NORMAN was the marketing "arm" for his two sons, defendants SAM Dehko and JORDAN Dehko, and their respective medical offices, Level 1 Health Systems of Michigan, LLC., and Michigan First rehab, LLC.   In fact, defendant Dehko maintained his office inside the office held by Level 1 Health Systems of Michigan.

***

27.     The Scheme, giving rise to this cause of action, was an orchestrated fraud between Defendants NORMAN, and Defendant Dr. Pedro Toweh.  Based on information and belief, defendant NORMAN, through his 1-800-PAIN-800 referral arm, would illegally solicit auto accident victims, and transport those individuals to the medical offices of Dr. Pedro Toweh.  At all times relevant, Defendant Toweh operated his medical clinic from a rented space inside Dehko's building, located at [Greenfield], curiously under the NPI of a different physician named Dr. Ferguson.  This arrangement was masterminded by defendant Norman Dehko for the sole purpose of an orchestrated insurance fraud scheme.

Upon receiving the patients from Defendant Dehko, Dr. Pedro Toweh would then execute a prescription for a number of "medically necessary treatments", including physical therapy, chiropractic services, and durable medical equipment (DME), which as it relates to the matters before this Court, the chiropractic treatment was provided by Plaintiff Lint Chiropractic.

After Defendant Toweh would execute the prescriptions, Defendant NORMAN would then transport the patients in his 1-800-PAIN-800 transport vans over to Level 1 Health Systems of Michigan, LLC. and Michigan First Rehab, LLC., purportedly owned and operated by his two sons, defendants SAM and JORDAN.

93.     On April 19, 2023, Allstate sued Lint Chiropractic, P.C., alleging that it engaged in a scheme to defraud by billing for medically unnecessary treatment that included the trigger point impedance imaging ("TPII") and localized intense neurostimulation therapy ("LINT") through Nervomatrix machines that were located at various medical facilities, including Level 1 Physical Therapy and Michigan First Rehab.  *See Allstate Insurance Company v. Lint Chiropractic, P.C.,*

United States District Court for the Eastern District of Michigan, Case No.: 2:23-cv-10904-FKB-DG.

94.     True and accurate excerpts from the aforementioned Complaint are depicted below.

45.     Defendant Super used defendants Lint, MI Medical, Excel, and AS Medical to bill for purported trigger point impedance imaging ("TPII") and localized intense neurostimulation therapy ("LINT").

46.     These purported treatments consisted of nothing more than purporting to identify and attempting to relieve trigger points through electrical stimulation, which are the same services typically billed by physicians, chiropractors, and physical therapists for a small fraction of the amount billed by the defendants, and which services would have been subject to the No-Fault Act's fee schedule if billed as such.

47.     Purported TPII and LINT services were allegedly done using equipment called Nervomatrix machines, which Super and Lint owned, leased, and otherwise controlled in Michigan.

***

68.   The defendants intentionally installed their Nervomatrix machines in clinics that have a lengthy history of abuse of Michigan's No-Fault system.

69.   For example, Super leased several Nervomatrix machines to physical therapy clinics owned and controlled by Norman Dehko and his family, including Level One Health Systems of Michigan, LLC ("Level One"), Michigan First Rehab, LLC ("Michigan First"), and Therapy Professionals, LLC ("Therapeutic Professionals").

***

75.   Norman Dehko, who is a layperson, has continued to direct purported treatment of patients who claim to have been in motor vehicle accidents by identifying such patients through his family's auto body shops and directing them to clinics owned by himself and his family members, including the clinics listed above at which the defendants installed Nervomatrix machines.

95.   Lastly, on November 18, 2024, the U.S. Attorney's Office for the Western District of Michigan announced that Toweh had agreed to pay $85,822.00 to resolve allegations that he ordered over 800 medically unnecessary orthotic braces in exchange for kickbacks.

## V.   THE DEFENDANTS' FRAUDULENT SCHEME

### A.   BACKGROUND

96.   The Defendants unlawfully solicited automobile accident victims and steered them to Select Medical Group (and other medical providers).

29

97.     The Dehkos utilized the businesses Somerset Auto and 1-800-PAIN to solicit motor vehicle accident victims to one or more of the Provider Defendants.

98.     Moreover, the Defendants used runners, tow truck drivers, and other healthcare providers to obtain the necessary patients needed to exploit Michigan's No-Fault laws.

99.     Specifically, in the prior Allstate lawsuit, it alleged that Somerset Auto provided accident victims with a packet of information that included materials designed to steer patients to the Provider Defendants.

100.    A true and accurate image of the Somerset Auto materials is depicted below.



*See Allstate Insurance Company v. Kinetix Rehab Services Inc.,* United States District Court for the Eastern District of Michigan, C.A. No. 2:20-cv-12783-BAF-DG (ECF No. 1, ¶ 91).

101.   Select Medical Group submitted bills to the Plaintiffs for medical tests, treatment, and services that were (1) not rendered; (2) medically unnecessary and pursuant to a predetermined treatment protocol; (3) fraudulently billed; and/or (4) not lawfully rendered.

102.   Select Medical Group then referred the Plaintiffs' claimants to Level 1 Physical Therapy and/or Michigan First Rehab for purported physical therapy services that were (1) not rendered; (2) medically unnecessary and pursuant to a predetermined treatment protocol; (3) fraudulently billed; and/or (4) not lawfully rendered.

103.   As part of this scheme, the Defendants referred the Plaintiffs' claimants to Rent A Ride for purported transportation services that were not actually provided, not medically necessary, unlawful, and fraudulently billed.

104.   The Provider Defendants primarily operated their fraud scheme from two (2) locations: 26321 Woodward Avenue, Huntington Woods, Michigan (the "Woodward Avenue Clinic") and 23350 Greenfield Road, Oak Park, Michigan (the "Greenfield Road Clinic").

**B.**   **THE WOODWARD AVENUE CLINIC**

105.   Level 1 Physical Therapy, Rent A Ride, and 1-800-PAIN operate out of the Woodward Avenue Clinic.

106.   A true and accurate Google Maps image of the Woodward Avenue Clinic is depicted below.



107.   The Woodward Avenue Clinic was purchased by Dehko Investment, Inc. on or about April 2, 2012.

108.   Both 1-800-PAIN-800 and Level 1 Physical Therapy have prominent signage at the Woodward Avenue Clinic.

109.   In a recent USAA Casualty Insurance Company deposition, Sabah Dehko testified that Norman Dehko owns the Woodward Avenue Clinic, and that Level 1 Physical Therapy pays rent to Dehko Investment for its use.

> Q.    Who does Level 1 PT pay rent to?
>
> A.    A company named Dehko Investments.

110.    The Woodward Avenue Clinic displays signage for "1-800-PAIN-800", "Level 1 Physical Therapy", "Know Your Rights $$$" and "We help Auto Accident Victims".

111.    During a site visit to the Woodward Avenue Clinic, the Plaintiffs' investigators obtained the below photograph, which is a true and accurate depiction of the front door of the Woodward Avenue Clinic.



112.   Upon arriving at the Woodward Avenue Clinic, the Plaintiffs'
investigators were met at the door by a man named James who had a cellphone in
his hand.

113.   James advised the Plaintiffs' investigators that "the boss" wanted to
speak with the investigators.

114.   James held the cellphone in front of one of the Plaintiffs' investigators who had "the boss" on FaceTime.

115.   One of the Plaintiffs' investigators identified himself and asked to whom he was speaking.

116.   "The boss" replied "Bob" and refused to provide his last name.

117.   The other investigator recognized "Bob" from prior interactions and said, "Hello Norman, do you remember me?"

118.   Norman Dehko lied to the Plaintiffs' investigators in an effort to fraudulently conceal his identity.

119.   "The boss" of the Woodward Avenue Clinic was and is Norman Dehko.

120.   James then allowed the Plaintiffs' investigators into the Woodward Avenue Clinic where they met with Sam (i.e., Sabah Dehko).

121.   Sabah Dehko admitted to the Plaintiffs' investigators that both a marketing company and clinic were located in the Woodward Avenue Clinic.

122.   Sabah Dehko abruptly ended the conversation and referred all questions to "Norman".

### C.   THE GREENFIELD ROAD CLINIC

123.   Michigan First Rehab is located at the Greenfield Road Clinic, which according to the prior Allstate suit, is owned by Edmyne Dehko (a family member of Norman Dehko).

35

124.    Select Medical Group also operates out of the Greenfield Road Clinic.

125.    Signage at the Greenfield Road Clinic contains two signs, "Michigan First Physical Therapy" and "Select Medical Group/Deluxe Dental".

126.    True and accurate images from the Greenfield Road Clinic are depicted below.





127.   During a site visit to the Greenfield Road Clinic, two of the Plaintiffs' investigators obtained the photographs depicted in paragraph 126 above.

128.   Neither of the signs provide a telephone number that is associated with each practice.

129.   While at the Greenfield Road Clinic, the two investigators visited Michigan First Rehab where they were instructed to meet with Jordan (i.e., Jordan Dehko).

130.   The Plaintiffs' investigators were subsequently informed that Jordan Dehko was too busy to meet them.

131.   While at the Greenfield Road Clinic, the Plaintiffs' investigators also visited Select Medical Group.

132.   Toweh was not present that day.   However, Hangming Ruan, PA ("Ruan") was present.

133.   While at the Greenfield Road Clinic location, the Plaintiffs' investigators observed a white 2020 BMW 8 Series 840I-Coupe, whose license plate was registered to Norman Sabah Dehko at 16425 NE 31st Avenue, North Miami Beach, Florida.

134.   Also, while at the Greenfield Road Clinic location, the Plaintiffs' investigators observed a 1-800-PAIN-800 transportation van.

135.   The signage on the van advertised the following:

- "We Help Auto Accident Victims"
- "Life Medical Expenses Paid"
- "Attendant Care/Nursing Services"
- "Uninsured"
- "Household Services – Daily Payments"
- "85% of Gross Weekly Wage"
- "Pain & Suffering"
- "Mileage/Free Transportation"
- "Unemployed"

136.   A true and accurate photograph taken by the Plaintiffs' investigator at

the Greenfield Road Clinic is depicted below.



137.   The 2017 Chrysler Pacific Touring Van is registered to Rent a Ride of

Detroit, 26321 Woodward Avenue, Huntington Woods, Michigan.

138.   According to the Allstate lawsuit, Jordan Dehko indicated that patients of Michigan First Rehab originated with 1-800-PAIN.

139.   In a recent USAA Casualty Insurance Company deposition, Sabah Dehko testified that he was unaware as to whether Level 1 Physical Therapy received referrals from 1-800-PAIN and Somerset Auto.

```
Q.    Does Level 1 PT receive referrals through 1-800 Pain?

A.    I don't know.

Q.    Does Level 1 PT receive referrals through 248-632 Pain?

A.    I don't know who that is.
```

140.   Sabah Dehko denied that an individual named "James" was employed by Level 1 Physical Therapy and further denied knowing whether "James" was an employee of 1-800-PAIN.

```
            Is there somebody named James who works for
      Level 1 PT?

A.    No.
```

***

```
Q.    Sir, I asked you a few minutes ago about a James.
            Is there a James who works for 1-800 Pain dash
      800?

A.    That's not my company.  I don't know, sir.
```

141. However, in an interview with Ziv Tamir, who is known on various social media platforms as "The Watch Guy", Sabah Dehko provided an overview of 1-800-Pain:

Ziv Tamir:          "So let me ask you a question, your company is 1-800?"

Sabah Dehko:        "Pain-800."

Ziv Tamir:          "Pain-800, Pain-800."

Sabah Dehko:        "My dad's company."

Ziv Tamir:          "And what separates you from everyone else?"

Sabah Dehko:        "We pick up, we pick up patients.  We bring them to their office appointments.  We set up the claim.  We send them to the best lawyers.  We're actually located in Michigan. That's our main area."

Ziv Tamir:          "Oh, no way. But do you work all over, like if someone gets injured in Florida, could they call you?"

Sabah Dehko:        "They could call us still for yeah."

Ziv Tamir:          "I love it."

Sabah Dehko:        "We have someone we can send them to."

Ziv Tamir:          "Ok. Great. But Michigan, Michigan is where you're mainly based out of, eh?"

Sabah Dehko:     "Based in Michigan.  That's where we're from actually. We come here and enjoy ourselves."

Ziv Tamir:          "I love it."

142.   Sabah Dehko is depicted below in a screenshot of a TikTok video posted by Ziv Tamir, wherein the foregoing conversation took place in Miami Beach, Florida.



143.   Testimony provided to the Plaintiffs by Level 1 Physical Therapy's independent contractor, Vishnu Kodumuru, P.T. ("Kodumuru"), on two (2) separate dates further confirmed that Level 1 Physical Therapy provides patient transportation to patients through 1-800-PAIN.

```
Q.    Does Level 1 provide transportation to patients?
A.    Yes.
Q.    What transportation company?
A.    1-800 Pain.
```

***

```
Q.    That's fair.  Do you know who provides the
      transportation?
A.    1-800-PAIN.
Q.    And does 1-800-PAIN also set up the transportation for
      the patients?
A.    Yes, yes.
```

144.   Upon information and belief, Norman Dehko operates the 1-800-PAIN.

## VI.   BILLING FOR SERVICES NOT RENDERED

145.   The Defendants' scheme involved billing for tests, treatment, and services not actually rendered to the Plaintiffs' claimants.

146.    By controlling the treatment of patients, the Defendants ensured that solicited patients were referred to the Provider Defendants.

147.    As discussed above, the Provider Defendants were either owned and controlled by members of the Dehko family, or had financial relationships with the Dehkos, Somerset Auto, and 1-800-PAIN, to ensure that the Dehkos received the financial benefit of the insurance fraud scheme.

148.    All of the fraudulent bills submitted to the Plaintiffs by the Defendants for services not actually performed were sent through the U.S. Mail.

### A.    BILLING FOR TRANSPORTATION NOT RENDERED

149.    Rent A Ride billed the Plaintiffs for purported transportation services that were never actually provided.

150.    Sabah Dehko has previously testified that he has heard of 1-800-PAIN on the radio and has never heard of Rent A Ride.

151.    In testimony provided to USAA Casualty Insurance Company, Sabah Dehko denied having ownership in Dehko Investment, Inc. and testified that he was unaware as to whether his father, Norman Dehko, was the owner.

Q.   Are you an owner of Dehko Investments?

A.   No.

Q.   Is your father an owner of Dehko Investments, if you know?

A.   I don't know.

152. Despite this testimony, the Transportation Network Company, Limousine Carrier or Taxicab Carrier application completed by the Jordan Dehko identifies Norman Dehko as the Authorized Agent for Service of Process and Sabah Dehko an agent of Rent A Ride.

153. Further, this application identifies Rent A Ride's telephone number as (313) 341-4444.

154. During Sabah Dehko's deposition, he was asked about the telephone number (313) 341-4444, which appeared on Level 1 Physical Therapy's website.

> Do you see that where it says: Personalized
> treatment plan, free transportation, zero out of pocket
> cost?
>
> A.   I do see that.
>
> Q.   Right.  So -- and it says to call (313)341-4444 to
> schedule.
>
>      So, if I called that 313 number, who would
> answer the phone?
>
> A.   I don't know.

155.   Further, when asked about Level 1 Physical Therapy's relationship with Somerset Auto, Sabah Dehko provided the following testimony:

> Q.   So what is Level 1 PT's relationship with Somerset Auto?
>
> A.   No relationship.
>
> Q.   So why when the (313)341-444 ([sic]) number is called
> does someone answer saying Somerset Auto?
>
> A.   I don't know.  They must have changed their number.  We

156.   Despite testifying that Level 1 Physical Therapy had no relationship with Somerset Auto, the Level 1 Physical Therapy Instagram account provides evidence to the contrary, as Level 1 Physical Therapy advertises "Free Transportation Call: (313) 341-4444", which is the telephone number for Somerset Auto.

45

157.   A true and accurate image of the Level 1 Physical Therapy Instagram account is depicted below.



158.   Rent A Ride submitted over 100 separate charges to the Plaintiffs for allegedly transporting patients to and from medical appointments on dates of service when the patients did not actually receive treatment, including the patients identified in Exhibit 4.

159.   For example, Rent A Ride billed the Plaintiffs for roundtrip transportation of patient K.C.[1] (Claim No. 011211690-008) on May 24, 2022.

160.   A true and accurate copy of the Rent A Ride invoice is depicted below:

---

[1] To protect the confidentiality of its insureds, the Plaintiffs refer to them herein by initials and claim number.

46

**RENT A RIDE OF DETROIT**
26321 WOODWARD AVE
HUNGINTON, MI 48072
(248)430-7633

Page: 1                                                                                          6/6/2022

| Patient: | | Instructions: |
| Chart #: | | Complete the patient information portion of your insurance claim form. Attach this bill, signed and dated, and all other bills pertaining to the claim. If you have a deductible policy, hold your claim forms until you have met your deductible. Mail directly to your insurance carrier. |
| Case #: | 426 | |

| Date | Description | Procedure | Modifier | Dx 1 | Dx 2 | Dx 3 | Dx 4 | Units | Charge |
|------|-------------|-----------|----------|------|------|------|------|-------|--------|
| 5/10/2022 | Pickup/Drop off nonemergency | A0100 | | | | | | 1 | 125.00 |
| 5/10/2022 | Pickup/Drop off nonemergency | A0100 | | | | | | 1 | 125.00 |
| 5/11/2022 | Pickup/Drop off nonemergency | A0100 | | | | | | 1 | 125.00 |
| 5/11/2022 | Pickup/Drop off nonemergency | A0100 | | | | | | 1 | 125.00 |
| 5/16/2022 | Pickup/Drop off nonemergency | A0100 | | | | | | 1 | 125.00 |
| 5/16/2022 | Pickup/Drop off nonemergency | A0100 | | | | | | 1 | 125.00 |
| 5/17/2022 | Pickup/Drop off nonemergency | A0100 | | | | | | 1 | 125.00 |
| 5/17/2022 | Pickup/Drop off nonemergency | A0100 | | | | | | 1 | 125.00 |
| 5/18/2022 | Pickup/Drop off nonemergency | A0100 | | | | | | 1 | 125.00 |
| 5/18/2022 | Pickup/Drop off nonemergency | A0100 | | | | | | 1 | 125.00 |
| 5/23/2022 | Pickup/Drop off nonemergency | A0100 | | | | | | 1 | 125.00 |
| 5/23/2022 | Pickup/Drop off nonemergency | A0100 | | | | | | 1 | 125.00 |
| 5/24/2022 | Pickup/Drop off nonemergency | A0100 | | | | | | 1 | 125.00 |
| 5/24/2022 | Pickup/Drop off nonemergency | A0100 | | | | | | 1 | 125.00 |
| 5/25/2022 | Pickup/Drop off nonemergency | A0100 | | | | | | 1 | 125.00 |
| 5/25/2022 | Pickup/Drop off nonemergency | A0100 | | | | | | 1 | 125.00 |
| 5/31/2022 | Pickup/Drop off nonemergency | A0100 | | | | | | 1 | 125.00 |
| 5/31/2022 | Pickup/Drop off nonemergency | A0100 | | | | | | 1 | 125.00 |
| 6/1/2022 | Pickup/Drop off nonemergency | A0100 | | | | | | 1 | 125.00 |
| 6/1/2022 | Pickup/Drop off nonemergency | A0100 | | | | | | 1 | 125.00 |
| 6/2/2022 | Pickup/Drop off nonemergency | A0100 | | | | | | 1 | 125.00 |
| 6/2/2022 | Pickup/Drop off nonemergency | A0100 | | | | | | 1 | 125.00 |
| 6/6/2022 | Pickup/Drop off nonemergency | A0100 | | | | | | 1 | 125.00 |
| 6/6/2022 | Pickup/Drop off nonemergency | A0100 | | | | | | 1 | 125.00 |

161.    However, K.C. never received medical treatment on May 24, 2022.

162.    Billing the Plaintiffs for medical transportation of patients when patients did not actually receive medical care constitutes billing for services not rendered in violation of Michigan law.

163.    The Plaintiffs are not required to pay the Defendants for services that were never provided to the Plaintiffs' claimants and they are entitled to recover any

payments tendered to the Defendants in reliance on their fraudulent billing for services not rendered.

164.   All of the bills submitted by the Defendants through the U.S. Mail seeking payment from the Plaintiffs for transportation services that never occurred are fraudulent.  *See* Exhibit 4.

## B.   Billing for One-on-One Supervision Not Performed

165.   The Defendants used Level 1 Physical Therapy and Michigan First Rehab to bill the Plaintiffs for physical therapy treatment that was never rendered to the Plaintiffs' claimants.

166.   Specifically, Level 1 Physical Therapy and Michigan First Rehab billed the Plaintiffs on average $117.50 pursuant to CPT Code 97110 (therapeutic exercise), $120.00 pursuant to CPT Code 97112 (neuromuscular reeducation), $105.00 pursuant to CPT Code 97116 (gait training with stairs), and $120.00 pursuant to CPT Code 97530 (therapeutic activity) that are classified by the American Medical Association's Current Procedural Terminology ("CPT") Coding Manual as procedures mandating a "physician or therapist required to have direct (one-on-one) patient contact."

167.   These physical therapy treatments billed by Level 1 Physical Therapy and Michigan First Rehab expressly require (1) direct, one-on-one patient contact,

and (2) constant attendance from a single provider exclusively monitoring a single patient.

168.   A physical therapist cannot bill for these specific CPT codes while treating multiple patients.

169.   Level 1 Physical Therapy and Michigan First Rehab routinely billed the Plaintiffs for procedures requiring direct, one-on-one supervision and constant attendance when the Plaintiffs' claimants engaged in group exercises.

170.   Level 1 Physical Therapy and Michigan First Rehab cannot bill for treatment modalities that require direct, one-on-one supervision, including all therapeutic exercises, neuromuscular reeducation, gait training, and therapeutic activities, if the Plaintiffs' claimant can perform the procedure independently without skilled intervention.

171.   The therapeutic exercises most commonly billed by the Defendants, such as "stretching", "treadmill", and "exercise bike" are not the type that require one-on-one direct contact with a licensed physical therapist.

172.   To properly bill for alleged one-on-one therapeutic exercises, Level 1 Physical Therapy and Michigan First Rehab must document: (1) the need for the treatment performed; (2) the time spent in performing the procedure; (3) the equipment necessary to provide the treatment; and (4) evidence of direct one-on-one treatment.

173.   Patients at issue herein reported to the Plaintiffs that treatments billed by the Defendants were not actually supervised.

174.   For example, Patient K.C. (Claim No. 011211690-008) testified that his exercises at Level 1 Physical Therapy included the unattended use of a treadmill, which Level 1 Physical Therapy routinely billed using CPT Code 97110, thus (mis)representing that the exercises involved supervision not actually performed.

175.   Patient K.C. further testified that that he selected the exercises and stretches to perform himself, as well as their duration, on each date of service and that he frequently did not see a physical therapist until it was time for a heating pad.

176.   On certain dates of service, Patient K.C. testified that there could be as many as seven (7) or eight (8) other patients in the room receiving treatment, in which the two (2) staff members present would intervene only if a patient was incorrectly performing an exercise.

177.   Level 1 Physical Therapy never billed the Plaintiffs for a single unit of group therapy and instead only billed for alleged "one-on-one" exercises, which can be billed at a higher rate.  *See* Exhibit 1.

178.   Level 1 Physical Therapy and Michigan First Rehab billed the Plaintiffs for purported therapeutic exercises pursuant to CPT Code 97110, which cannot be billed relative to previously taught exercises, patients performing exercises

independently, or the use of exercise equipment without the direct, one-on-one intervention or skills of the therapist.

179.   The therapeutic exercises billed by Level 1 Physical Therapy and Michigan First Rehab were not actually performed in connection with the Plaintiffs' claimants identified in Exhibits 1 and 2 and constitute fraudulent billing.

180.   Level 1 Physical Therapy and Michigan First Rehab billed the Plaintiffs for neuromuscular reeducation pursuant to CPT Code 97112, which requires direct, one-on-one intervention, as the therapist is required to provide specific instructions to the patient as to each technique, as well as specific feedback about the quality or specifics of a particular movement.

181.   The neuromuscular reeducation billed by Level 1 Physical Therapy and Michigan First Rehab was not actually performed in connection with the Plaintiffs' claimants identified in Exhibits 1 and 2 and constitute fraudulent billing.

182.   Level 1 Physical Therapy and Michigan First Rehab billed the Plaintiffs for gait training pursuant to CPT Code 97116, which requires direct, one-on-one training in specific functional activities that are designed to improve the patient's ambulation.

183.   The gait training billed by Level 1 Physical Therapy and Michigan First Rehab was not actually performed in connection with the Plaintiffs' claimants identified in Exhibits 1 and 2 and constitute fraudulent billing.

184.   Level 1 Physical Therapy and Michigan First Rehab billed the Plaintiffs for therapeutic activity pursuant to CPT code 97530, which requires the intervention and skill of a therapist to perform dynamic activities that are designed to address mobility, strength, balance, or coordination.

185.   The therapeutic activity billed by Level 1 Physical Therapy and Michigan First Rehab was not actually performed in connection with the Plaintiffs' claimants identified in Exhibits 1 and 2 and constitute fraudulent billing.

186.   The Defendants submitted fraudulent claims to the Plaintiffs relative to each physical therapy treatment modality that were not actually provided, and the Plaintiffs relied on such submissions in adjusting the claims.

187.   Billing the Plaintiffs for physical therapy treatment modalities that were not actually provided constitutes billing for services not rendered.

188.   The Plaintiffs are not required to pay the Defendants for physical therapy treatment that was not actually rendered and they are entitled to reimbursement for payments they were induced to make by the Defendants' fraudulent submissions.

189.   All of the bills submitted by Level 1 Physical Therapy and Michigan First Rehab were submitted by the Defendants through the U.S. Mail seeking payment from the Plaintiffs for treatment that never occurred are fraudulent.

## VII.   <u>UNLAWFUL SOLICITATION</u>

190.   Michigan law prohibits "[a]ny physician or surgeon engaged in the practice of medicine in this state" from "employ[ing] any solicitor, capper, or drummer for the purpose of procuring patients."  Mich. Comp. Laws § 750.429.

191.   It is also unlawful in Michigan to contact any motor vehicle accident victim to offer a service within thirty (30) days of the accident, Mich. Comp. Laws § 750.410b.

192.   Moreover, it is unlawful to use police reports to solicit any person identified in the report, Mich. Comp. Laws § 257.503(1)(a).

193.   Only "lawfully-rendered[ed] treatment" is compensable under Michigan's No-Fault Act. Mich. Comp. Laws § 500.3157(1).

194.   In direct contravention to Michigan's prohibition of patient solicitation, the Defendants intentionally engaged in illegal solicitation, which renders the tests, treatment, and services billed by Select Medical Group, Level 1 Physical Therapy, Michigan First Rehab, and Rent A Ride unlawful.

195.   Defendant Somerset Auto used tow truck drivers to allegedly solicit prospective patient information so the Defendants could contact claimants and induce them to treat with the Provider Defendants.

196. In addition to the unlawful solicitation procured through Somerset Auto, the Defendants also operate 1-800-PAIN to unlawfully solicit alleged accident victims.

197. Once solicited, the Defendants provide transportation through Rent A Ride to ensure the Plaintiffs' claimants present for treatment at Select Medical Group, Level 1 Physical Therapy, and/or Michigan First Rehab.

198. Importantly, many of the Plaintiffs' claimants solicited by the Defendants did not actually need medical treatment.

199. Rather, the Defendants knew that the Plaintiffs' claimants would enable them to prescribe a predetermined treatment protocol of medically unnecessary treatment, to maximize the amount they could bill to the Plaintiffs.

200. In prior litigation involving the Defendants, it was revealed that the Defendants offered cash payments to patients to induce them to seek medically unnecessary treatment.

201. Kickback payments, unlawful solicitation, and treatment directed by laypersons negate the validity of the medical treatment.

202. The Plaintiffs are not required to pay the Defendants for any treatment, tests, or services that were unlawfully solicited and they are entitled to recover any payments tendered to the Defendants in reliance on their fraudulent submissions.

203.   All of the bills submitted by Select Medical Group, Level 1 Physical Therapy, and Michigan First Rehab were submitted by the Defendants through the U.S. Mail seeking payments for unlawfully solicited tests, treatment, and services.

204.   All treatment that was unlawfully solicited and directed by laypeople was unlawful, and the Plaintiffs have no obligation to pay any charges.

## VIII.  UNLICENSED SERVICES

205.   The Defendants billed the Plaintiffs for unlicensed services in violation of Michigan law.

### A.    UNLICENSED TRANSPORTATION SERVICES

206.   Defendant Rent A Ride billed the Plaintiffs for alleged transportation of patients.

207.   Rent A Ride did not possess the requisite license to perform transportation services in Michigan.

208.   The Michigan Department of Licensing and Regulatory Affairs ("LARA") regulates 1-8 passenger transportation vehicles ("limousine carriers") and requires that all transportation companies obtain a valid limousine carrier license.

209.   LARA mandates that the limousine carrier license must be renewed yearly with proof of automobile liability insurance.

210.   Rent A Ride has failed to comply with these licensure requirements.

211. Rent A Ride first billed the Plaintiffs for transportation services on February 15, 2018. *See* Exhibit 4.

212. Rent A Ride did not apply for a license until January 17, 2019, more than eleven (11) months after Rent A Ride first billed the Plaintiffs.

213. LARA denied Rent A Ride's application.

214. A true and accurate depiction of the relevant section of the license application is depicted below.



215.   A true and accurate depiction of LARA's January 18, 2019 denial letter is depicted below.

January 18, 2019

Rent A Ride of Detroit
Attn:  Jordan Dehko
26321 Woodward Ave.
Huntington Woods, MI   48070

Dear Jordan Dehko:

SECOND NOTICE OF INCOMPLETE APPLICATION

Re:  Application – Transportation Network Company, Limousine Carrier or Taxicab Carrier

Your application for registration is incomplete.  In order to continue in the processing of your application, you must submit the following information and/or documentation listed below.

1.   Submit proof of insurance as required by:
     Transportation Network Company – MCL 257.2123
     Limousine Carrier – MCL 257.2119
     Taxicab Carrier – MCL 257.2121

     **Submit a Certificate of Liability Insurance.  The Department of Licensing and Regulatory Affairs, CSCL, P.O. Box 30018, Lansing, MI   48909 must be listed as a Certificate Holder.**

     **The department cannot accept insurance that refers to MDOT and MCL 474.109 and MCL 257.1913 or State of Michigan Certificate of No-Fault Insurance.**

2.   Submit Entity Documents (Certificate of Incorporation, Article of Organization).  If a sole proprietorship or partnership, provide copy of Assumed Name Certificate (DBA) issued from your County Clerk's Office.

Please respond to this notice within 30 days.

216.   Although Rent A Ride eventually obtained a license on January 17, 2023, the license lapsed on August 31, 2023.

217.   Accordingly, any billing submitted to the Plaintiffs by Rent A Ride for transportation services to Plaintiffs' claimants for all dates of service except January 17, 2023 through August 31, 2023 are unlawful and fraudulent.

218.   The Plaintiffs are not required to pay Rent A Ride for unlawful transportation without a valid license, and they are entitled to reimbursement for all of the payments made in connection with Plaintiffs' claimants identified in Exhibit 4.

219.   All of the bills submitted by Rent A Ride were submitted by the Defendants through the U.S. Mail seeking payment from the Plaintiffs for unlicensed transportation services that were fraudulent.

## IX.   UNNECESSARY FRAUDULENT TREATMENT

220.   The Plaintiffs' claimants were ordered to undergo medically unnecessary tests, treatment, and services.

221.   The American Medical Association defines medical necessity as: "healthcare services or products that a prudent physician would provide to a patient for the purpose of preventing, diagnosing or treating an illness, injury, disease, or symptoms in a manner that is (a) in accordance, with generally accepted standards of medical practice; (b) clinically appropriate in terms of type, frequency, extent, site, and duration; and (c) not primarily for the economic benefit of the health plans and purchasers or for the convenience of the patient, treating physician, or other health care provider" (Institute of Medicine, Committee on Defining and Revising an Essential Health benefits Package for Qualified Health Plan (2011)).

222.   The Defendants are not entitled to No-Fault benefits for medically unnecessary tests, treatment, and services that were rendered pursuant to a predetermined treatment protocol for the primary purpose of collecting payment from the Plaintiffs.

223.   The Defendants' scheme followed an unmistakable pattern that started with the unlawful solicitation of auto vehicle accident victims.

224.   Once solicited, the patients were referred to Select Medical Group to obtain the required referrals necessary for the other Provider Defendants to bill the Plaintiffs.

225.   The referral to Select Medical Group was two-fold: (1) to bill the Plaintiffs for unnecessary evaluations, tests, and treatment; and (2) provide the required justification for physical therapy and transportation services to allow the Defendants to maximize the amount they billed to the Plaintiffs.

226.   Mich. Comp. Laws § 333.17820(1) requires that physical therapy exceeding twenty-one (21) days or ten (10) visits must be prescribed by a licensed medical or osteopathic doctor.

227.   Because Select Medical Group made nearly identical diagnoses (regardless of the patient's injury) and subsequently prescribed the same predetermined treatment, none of the treatment billed by Select Medical Group was medically necessary.  *See* Exhibit 9.

228.   Indeed, Select Medical Group patients received nearly identical nonspecific diagnoses of their alleged injuries, including "headache", "cervicalgia," "pain in thoracic spine," "low back pain," and "pain" in various extremities and joints.

229.   For example, as a result of the initial evaluation that was performed on November 25, 2019, Ruan documented that the patient, L.W. (Claim No. 038308612-010) had neck pain, cervical dystonia, and muscle pain right cervicogenic (headache), and diagnosed L.W. with cervicalgia, myalgia unspecified site, and other dystonia (i.e., involuntary muscle contractions).

230.   A true and accurate image from the Select Medical Group initial evaluation report for the patient L.W. is depicted below.

**Assessment**

neck pain
cervical dystonia
muscle pain right cervicogenic

Diagnoses attached to this encounter:
  (M54.2) Cervicalgia
  (M79.10) Myalgia, unspecified site
  (G24.8) Other dystonia

231.   After making generic, nearly identical diagnoses, Select Medical Group prescribed the same unnecessary treatment protocol, which included referrals to

physical therapy and transportation, re-evaluations at Select Medical Group to ensure that the treatment protocol was being implemented, MRIs, prescription medication, durable medical equipment, and urine drug testing.

232. A true and accurate image from Select Medical Group's initial evaluation report for the patient, M.M. (Claim No. 047504898-008) detailing the treatment plan is depicted below.

233. Importantly, Select Medical Group created the prescriptions and diagnoses required for the other Provider Defendants to bill the Plaintiffs for unnecessary tests, treatment, and services.

234. For example, the patient K.C. (011211690-008) testified that he was provided with transportation every time he treated at Level 1 Physical Therapy and that he was informed that ***he had to use this transportation*** in connection with his treatment.

> Q.   So then is there a reason why you chose to use
>      transportation versus driving yourself to the doctor's
>      appointments?
> A.   They never provided me driving myself as an option.
> Q.   Okay.  So they told you you had to use their
>      transportation?
> A.    Correct.

235.   Rent A Ride provided nearly exclusive transportation services to the Plaintiffs' claimants treating at Select Medical Group, Level 1 Physical Therapy and Michigan First Rehab, as the three (3) entities are owned and controlled by the Dehko family.

236.   The Plaintiffs have no obligation to pay for transportation services that were medically unnecessary.

237.   Subsequent to the referral by Select Medical Group, Level 1 Physical Therapy and Michigan First Rehab billed the Plaintiffs for unnecessary physical therapy treatment.

238.   The vast majority of motor vehicle accident cases involving the Plaintiffs' claimants were minor, resulting in only mild injuries that resolve within a few weeks without any treatment.

239.   The immediate resort to physical therapy treatment using a predetermined protocol of excessive treatment was not necessary.

240.   Select Medical Group's immediate referral for medically unnecessary physical therapy at Level 1 Physical Therapy and Michigan First Rehab are exemplified by the following representative patients:

- Patient K.C. (Claim No. 011211690-008): The Plaintiffs were billed for alleged treatment at Select Medical Group and Level 1 Physical Therapy on the same date, March 8, 2022.

- Patient Z.B. (Claim No. 003340911-080); The Plaintiffs were billed for an alleged initial evaluation at Select Medical Group on October 5, 2023; which was only six (6) days after the alleged motor vehicle accident.  Physical therapy at Level 1 Physical Therapy was billed starting the following day, October 6, 2023.

- Patient R.C. (Claim No. 046070364-023); The Plaintiffs were billed for an alleged initial evaluation at Select Medical Group on January 20, 2022. Physical therapy at Michigan First Rehab was billed starting the following day, January 21, 2022.

- Patient D.F. (Claim No. 034118858-012): The Plaintiffs were billed for an alleged initial evaluation at Select Medical Group on May 13, 2020. Physical therapy at Michigan First Rehab was billed on the following day, May 14, 2020.

241.   The Defendant physical therapy clinics nearly always prescribed treatment consisting of therapeutic exercises (CPT Code 97110), electrical stimulation (CPT Code 97014), manual therapy (CPT Code 97140), and application of hot/cold packs (CPT Code 97010).

242.   Level 1 Physical Therapy billed for application of hot/cold packs, therapeutic exercises, and electric stimulation, and manual therapy for 100% of the Plaintiffs' insureds.  *See* Exhibit 1.

243.   Level 1 Physical Therapy further billed for manual therapy for 88% of the Plaintiffs' insureds.  *See* Exhibit 1.

244.   Michigan First Rehab billed for application of hot/cold packs and therapeutic exercises for 100% of the Plaintiffs' insureds, and further billed electric stimulation for more 70% of the Plaintiffs' insureds and manual therapy for 65% of the Plaintiffs' insureds.  *See* Exhibit 2.

245.   At no point during the course of treatment at Select Medical Group, Level 1 Physical Therapy, or Michigan First Rehab did the clinics evaluate the efficacy of the predetermined treatment protocol.

246.   The medically unnecessary tests, treatment, and services were repeated without any documented benefit to patients.

247.   Even though the protocol treatment regime called for frequent evaluations at Select Medical Group, the Defendants' predetermined treatment protocol was almost never altered.

248.   The Defendants misrepresented the patients' complaints and objective findings to justify the predetermined treatment protocol.

249.   For example, patient V.F. (Claim No. 002884289-060) presented to the Royal Oak Hospital on June 4, 2019, one (1) day after the alleged motor vehicle accident.

250.   The Royal Oak Hospital emergency physician found that V.F. had normal range of motion in her neck, cervical spine, and thoracic spine, with tenderness at the lumbar spine.

251.   The Royal Oak Hospital records note that V.F. had no abdominal or chest pain, with normal findings for the shoulders, elbows, wrists, hops, knees, and ankles.

252.   On June 11, 2019, eight (8) days after the reported motor vehicle accident, V.F. presented at Level 1 Physical Therapy, which claims that V.F. had complaints of pain in the neck, thoracic spine, lumbar spine.

253.   Notably, the initial evaluation documents V.F.'s pain in the neck, thoracic spine, and lumbar spine as a 10/10 at its worst, 9/10 at its best, with the pain rated 9/10 at the time of the initial evaluation.

254.   Despite the prior normal range of motion findings at the Royal Oak Hospital, Level 1 Physical Therapy further noted that V.F. had reduced spinal mobility and functional mobility due to pain and stiffness.

255.   As evidenced by patient V.F., these purported findings recorded by Level 1 Physical Therapy were utilized to justify the excessive course of physical therapy, which continued for just over eight (8) months.

256.   All of the claims submitted by the Defendants to the Plaintiffs through the U.S. Mail seeking payment for unnecessary treatment are fraudulent.

257.   The Plaintiffs are not required to pay the Defendants for treatment that was medically unnecessary.

258.   The Plaintiffs are not required to pay the Defendants for unnecessary tests, treatment, and services provided to the Plaintiffs' claimants and they are entitled to recover any payments tendered to the Defendants in reliance on their fraudulent billing for unnecessary tests, treatment, and services.

259.   All of the bills submitted by the Defendants were submitted by the Defendants through the U.S. Mail seeking payments from the Plaintiffs for unnecessary tests, treatment, and services.

**B.   MEDICALLY UNNECESSARY TPII AND LINT TREATMENT**

260.   In furtherance of this scheme, the Defendants utilized medically unnecessary and excessive trigger point impedance imaging ("TPII") and localized intense neurostimulation therapy ("LINT") to maximize the amount billed to the Plaintiffs.

261.   TPII is a noninvasive treatment that uses electrodermal information from active myofascial trigger points to deliver localized neurostimulation. *See Allstate Ins. Co. v. Lint Chiropractic, P.C.*, 2024 U.S. Dist. LEXIS 96270 (citing Miguel Gorenberg & Kobi Schwartz, *Imaging-Guided Hyperstimulation Analgesia in Low Back Pain*, 6 J. Pain Res. 487, 487 (2013)).

262. LINT, or hyperstimulation analgesia, involves applying low-rate electrical pulses to peripheral nerve endings at trigger points, stimulating the release of endorphins, serotonin, and cortisol. *Id.* (citing Gorenberg & Schwartz, *supra*, 488.

263.   These treatments were purportedly rendered to patients at Level 1 Physical Therapy and Michigan First Rehab using a Nervomatrix device.

264.   The Nervomatrix is used to treat "trigger points" – painful areas of knotting or tightness in muscles. *Id.* (citing ECF No. 1 at Page ID. 7-9).

265.   To do so, the Nervomatrix first scans for trigger points (TPII) and then treats them with electrical stimulation ("LINT"). *Id.* (citing ECF No. 1 at Page ID. 9, 44).

266.   The United States Food and Drug Administration classifies the Nervomatrix as a transcutaneous electrical nerve stimulation ("TENS") device, defined as "a device that produces an electric current to stimulate the nerves and

reduce pain." *See Bickerstaff v. Comm'r of Soc. Sec.*, No. 2:15-cv-10917, 2016 WL 4182756, at *2 (E.D. Mich. July 15, 2016).

267. According to the Nervomatrix website, the Nervomatrix device is used to locate trigger points through skin resistance and provide therapeutic neurostimulation, using modulated, intense electrical pulses, to specific scanned pain points.

268. A true and accurate image from the Soleve Nervomatrix website is depicted below.

**WHAT IS A SOLEVE NERVOMATRIX DEVICE?**

Soleve Nervomatrix is an FDA approved non-invasive neurostimulation device designed to be used to treat back and neck pain.

The device is a major new innovative alternative therapy to injections, steroids and drugs for the symptomatic relief of chronic back and neck pain.

**HOW DOES IT WORK? (3 PHASES)**

- **PHASE 1 SCAN:** 26 miniature probes touch but never enter the skin's surface to scan the back to determine the areas of low impedance. In just a few minutes, the electrical properties of hundreds of points on the lower back are acquired and analyzed. Computer imaging is used to analyze the data, to identify the lowest points of electrical resistance and to select the areas for therapeutic stimulation.
- **PHASE 2 TREAT:** Therapeutic neurostimulation, using modulated, intense electrical pulses, is then applied locally to the specific scanned pain points, providing highly effective pain relief by stimulating the release of endorphins.
- **PHASE 3 RELIEF:** Neurostimulation causes endorphins to be released for effective back pain relief. Following treatment, a detailed report of treatment data, and acquired & potential pain points is generated for the clinician to review.

269. TPII and LINT services were repeated to the Plaintiffs' claimants without the Defendants determining whether the purported services were beneficial.

270. Level 1 Physical Therapy and Michigan First Rehab diagnosed patients with vague diagnoses to create the appearance of necessity for the TPII and LINT services.

271.    For example, Patient K.C. (Claim No. 011211690-080) was diagnosed with several specific disc conditions and an acute annular tear based on the interpretation of MRI imaging that was performed at Affiliated Diagnostic of Oakland.

272.    To create the appearance of necessity for TPII and LINT services, Level 1 Physical Therapy diagnosed K.C. with unspecified low back pain (without reference to disc herniations).

273.    In connection with K.C., Level 1 Physical Therapy billed the Plaintiffs tens of thousands of dollars for worthless TPII and LINT treatment.

274.    Level 1 Physical Therapy and Michigan First Rehab regularly billed the Plaintiffs over $6,137.50 per date of alleged service to purportedly identify trigger points using TPII.

275.    A true and accurate image of the Level 1 Physical Therapy medical bill for the March 9, 2022 TPII treatment provided to the patient K.C. (Claim No. 011211690-008) is depicted below.



276.   TPII is not medically necessary to determine the presence of a trigger point.

277.   Trigger points can be treated with massage, ultrasound, electrical muscle stimulation, acupuncture, trigger point injections, and a variety of other methods.

278.   There is no evidence that LINT provides any therapeutic benefit beyond traditional methods of physical therapy treatment, which the Plaintiffs' claimants were already receiving at Level 1 Physical Therapy and/or Michigan First Rehab.

279.   The Defendants excessively billed the Plaintiffs for TPII and LINT Services, including:

a)  Level 1 Physical Therapy billed for TPII and LINT services to patient K.C. (Claim No. 011211690-080) on at least 34 separate dates.

b)  Level 1 Physical Therapy billed for at least 32 separate TPII and LINT services to patient C.H. (Claim No. 037439267-012).

c) Michigan First Rehab billed for at least 43 separate TPII and LINT services to patient M.W. (Claim No. 038189916-004).

d) Michigan First Rehab billed for TPII and LIN services to patient O.R. (Claim No. 037004789-001) on a least 24 separate date.

280.   The TPII and LINT services were repeatedly administered by persons who did not have any specialized training in the use of Nervomatrix machines.

281.   For example, the TPII and LINT services at Level 1 Physical Therapy were purportedly rendered by Kodumuru.

282.   In a recent deposition, Kodumuru admitted to the Plaintiffs that he was trained to use the Nervomatrix machine by Sabah Dehko, a non-licensed layperson.

```
Q.    And who trained you on how to use the trigger point
      impedance imaging device?

A.    Sam.

Q.    Now, sir, I got to be honest with you.  I know Sam
      doesn't even have a college degree, right?

A.    I don't know.

Q.    Well, he doesn't.

             How are you relying on someone who has zero
      medical training on how to utilize this device?

A.    He said that he got trained from the people who have
      manufactured the machine.
```

283.   In testimony provided to the Plaintiffs, Sabah Dehko previously admitted that he has no medical or medical billing training, and that he studied business in college but did not complete his degree.

```
Q.    All right.  Sir, so the -- the question was -- hang on
      one second.
                  What is your education background?
A.    I graduated high school and went to Wayne State
      University, and studied business, and did not finish
      college.
Q.    All right.  Are you the only owner of Level 1 PT?
A.    Yes.
Q.    How long have you been the owner?
A.    Since the origination of the company.
Q.    And when did the company originate?
A.    2018.
Q.    I think I saw from your license your date of birth is in
      1998; is that correct?
A.    Yes.
Q.    So you were about 20 when Level 1 PT was opened with you
      as the owner?
A.    Somewhere around that age, yes.
Q.    Okay.  Do you have any medical training?
A.    No.
Q.    All right.  And how about any medical billing training;
      any training in that area?
A.    No.
```

284.   Level 1 Physical Therapy and Michigan First Rehab utilized the Nervomatrix devices owned by Lint Chiropractic – which they refused to voluntarily return to Robert Super, D.C. – to render the unnecessary and excessive TPII and LINT treatment.   *See Lint Chiropractic, P.C. v. Level One Health Systems of Michigan, LLC.*, Circuit Court for the County of Oakland, Case No.: 2022-192340-CZ,

285.   As documented in the Complaint, Robert Super, D.C.'s attempts to "re-secure" possession of the devices were met by the Defendants with threats to destroy the machines and physical force to prevent Super from retrieving the devices.

286.   A true and accurate excerpt from the above referenced complaint is depicted below.

10. That in furtherance of concerns, Plaintiff sent to each facility their in-house chiropractor Corey Varawski to check on the machines; Mr. Varawski was denied access to see the machines and their placements.

11. That numerous text messages clearly demonstrate Plaintiff's attempts re-secure possession of the Lint machines which went both unanswered and became threatening from Defendants as the fact that they would destroy the property if they weren't paid money.

12. That thereafter the principles of Lint Chiropractic went to the various locations in an attempt to retrieve their equipment and were met with physicality in the form of punching and pushing or necessitating the involvement of police officers.

13. That there are police reports have been generated with both the City of Huntington Woods and the Southfield police department and will be provided to the court upon receipt thereof.

14. That additionally, Sabah Dehko locked the door with Plaintiff inside and threatened physical violence against them. After which time they again summoned the police and generated in Huntington Woods 22-0095.

15. That office Jacqueline Sieker of the Huntington Woods Police Department recommended that they take all measures civilly to re-secure the property.

16. That a present investigation is ongoing regarding the assault and battery which occurred by and between Plaintiffs and Defendants and the expectancy is that Defendants will be charged criminally.

287.   The Plaintiffs are not required to pay the Defendants for any of the unnecessary and excessive TPII and LINT treatment billed to the Plaintiffs as identified in Exhibit 5 that was based upon false examination findings pursuant to the Defendants' predetermined treatment protocol and they are entitled to

reimbursement for payments it was induced to make by the Defendants' fraudulent submissions.

288.  All of the bills submitted by Level 1 Physical Therapy and Michigan First Rehab were submitted by the Defendants through the U.S. Mail seeking payment for bogus TPII and LINT services.

### C.  UNNECESSARY TRANSPORTATION SERVICES

289.  Rent A Ride billed the Plaintiffs for purported medical transportation services that were medically unnecessary.

290.  Select Medical Group provided disability certificates to the Plaintiffs' claimants claiming they were unable to drive.

291.  Notably, the disability certificates were nondescript and failed to properly explain why a patient's medical condition or injury prevented the ability to drive.

292.  Rent A Ride utilized the disability certificates from Select Medical Group to attempt to justify the necessity of the transportation services.

293.  As discussed in paragraph 234 above, the Plaintiffs' claimants were induced by the Defendants into believing that they had to use the Rent A Ride transportation services regardless of need.

294.   Rent A Ride repeatedly billed for transportation services prior to any determination by a licensed healthcare provider that the patient required transportation services.

295.   The Plaintiffs are not required to pay the Defendants for any of the unnecessary transportation services that were billed pursuant to their predetermined treatment protocol and they are entitled to reimbursement for payments it was induced to make by the Defendants' fraudulent submissions.

296.   All of the bills submitted by Rent A Ride were submitted by the Defendants through the U.S. Mail seeking payment for unnecessary transportation services.

## X.   EXCESSIVE CHARGES

297.   The Defendants routinely billed the Plaintiffs at rates that were grossly excessive.

### A.   EXCESSIVE TRANSPORTATION FEES

298.   Rent A Ride nearly always billed the Plaintiffs exactly $250.00 per day per patient, regardless of the distance traveled.

299.   A true and accurate copy of a Rent a Ride invoice for the patient C.H. (Claim No. 037439267-012) is depicted below.



### RENT A RIDE OF DETROIT
26321 WOODWARD AVE
HUNGINTON, MI 48072
(248)430-7633

Page: 1                                                                          3/16/2022

**Patient:** ▮▮▮▮▮▮▮

Chart #:  HEACL000
Case #:   139

**Instructions:**
Complete the patient information portion of your insurance claim form. Attach this bill, signed and dated, and all other bills pertaining to the claim. If you have a deductible policy, hold your claim forms until you have met your deductible. Mail directly to your insurance carrier.

| Date | Description | Procedure | Modifier | Dx 1 | Dx 2 | Dx 3 | Dx 4 | Units | Charge |
|---|---|---|---|---|---|---|---|---|---|
| 11/26/2021 | PICK UP FROM HOME | 04 | | | | | | 1 | 125.00 |
| 11/26/2021 | DROP OFF TO 26321 WOODWARD | 00 | | | | | | 1 | 125.00 |
| 12/8/2021 | PICK UP FROM HOME | 04 | | | | | | 1 | 125.00 |
| 12/8/2021 | DROP OFF TO 26321 WOODWARD | 00 | | | | | | 1 | 125.00 |
| 11/22/2021 | PICK UP FROM HOME | 04 | | | | | | 1 | 125.00 |
| 11/22/2021 | DROP OFF TO 26321 WOODWARD | 00 | | | | | | 1 | 125.00 |
| 11/24/2021 | PICK UP FROM HOME | 04 | | | | | | 1 | 125.00 |
| 11/24/2021 | DROP OFF TO 26321 WOODWARD | 00 | | | | | | 1 | 125.00 |
| 1/31/2022 | PICK UP FROM HOME | 04 | | | | | | 1 | 125.00 |
| 1/31/2022 | DROP OFF TO 26321 WOODWARD | 00 | | | | | | 1 | 125.00 |
| 1/3/2022 | PICK UP FROM HOME | 04 | | | | | | 1 | 125.00 |
| 1/3/2022 | DROP OFF TO 26321 WOODWARD | 00 | | | | | | 1 | 125.00 |
| 1/10/2022 | PICK UP FROM HOME | 04 | | | | | | 1 | 125.00 |
| 1/10/2022 | DROP OFF TO 26321 WOODWARD | 00 | | | | | | 1 | 125.00 |
| 1/13/2022 | PICK UP FROM HOME | 04 | | | | | | 1 | 125.00 |
| 1/13/2022 | DROP OFF TO 26321 WOODWARD | 00 | | | | | | 1 | 125.00 |
| 1/5/2022 | PICK UP FROM HOME | 04 | | | | | | 1 | 125.00 |
| 1/5/2022 | DROP OFF TO 26321 WOODWARD | 00 | | | | | | 1 | 125.00 |
| 12/22/2021 | PICK UP FROM HOME | 04 | | | | | | 1 | 125.00 |
| 12/22/2021 | DROP OFF TO 26321 WOODWARD | 00 | | | | | | 1 | 125.00 |
| 12/27/2021 | PICK UP FROM HOME | 04 | | | | | | 1 | 125.00 |
| 12/27/2021 | DROP OFF TO 26321 WOODWARD | 00 | | | | | | 1 | 125.00 |
| 12/14/2021 | PICK UP FROM HOME | 04 | | | | | | 1 | 125.00 |
| 12/14/2021 | DROP OFF TO 26321 WOODWARD | 00 | | | | | | 1 | 125.00 |
| 12/21/2021 | PICK UP FROM HOME | 04 | | | | | | 1 | 125.00 |
| 12/21/2021 | DROP OFF TO 26321 WOODWARD | 00 | | | | | | 1 | 125.00 |
| 12/20/2021 | PICK UP FROM HOME | 04 | | | | | | 1 | 125.00 |

**Provider Information**
Provider Name:   RENT A RIDE
License:
Commercial PIN:
SSN or EIN:   200474173

| | |
|---|---|
| Total Charges: | $ 3375.00 |
| Total Payments: | $ 0.00 |
| Total Adjustments: | $ 0.00 |
| **Total Due This Visit:** | **$ 3375.00** |
| Total Account Balance: | $ 11,750.00 |

300.   Rent A Ride billed these excessive amounts even when it transported

multiple patients together.

301.    Likewise, Rent A Ride submitted bills to the Plaintiffs for patient O.R. (Claim No. 037004789-001) charging a $125.00 pick-up fee and a $125.00 return fee for each date of service at Select Medical Group and Michigan First Rehab.

302.    Yet, the Rent A Ride Round Trip Transportation Logs reflect O.R.'s residential address as the pick-up address and the Greenfield Road Clinic as the drop off address, with the two properties located five (5) miles from each other.

303.    Although these two addresses are consistently documented on each log, the round trip total miles range from 10 miles to 32 miles on the Round Trip Transportation Logs, indicating that an additional patient(s) was likely being transported at the same time and billed under the same flat rate.

304.    Rent A Ride's $250.00 charge is grossly excessive considering that these patients were transported relatively short distances.

305.    These rates are more than 6-8 times the cost to take an application-based ride-hailing service, such as Uber or Lyft, or a roundtrip taxi.

306.    Accordingly, Rent A Ride charged excessive rates for transportation services.

## B.    EXCESSIVE AND UNREASONABLE Charges or TPII and LINT

307.    The Defendants billed for alleged TPII pertinent to CPT code 95999 for as much as $4,787.50.

308.   The Defendants billed for alleged LINT pertinent to CPT code 99199 for as much as $1,350.00.

309.   Both CPT codes 95999 and 99199 are unlisted procedure codes.

310.   There are multiple factors to consider when determining the proper charges for unlisted procedures, including the nature of the service provided and its necessity based on the documentation and the relative value of similar treatments.

311.   Notably, testimony obtained by the Plaintiffs from one of the Defendant's treating providers and multiple claimants indicate that they were unaware as to the nature of the charges for this treatment.

312.   For example, Kodumuru, an independent contractor at Level 1 Physical Therapy, testified that he was not aware of what Level 1 Physical Therapy charged for the Nervomatrix treatment and appeared surprised when the amount was disclosed to him.

> Q.   Do you have any idea what Level 1 charges for the
>      Nervomatrix treatment?
>
> A.   No.
>
> Q.   If I told you it was over $6,000 per treatment, would
>      you -- would that surprise you?
>
> A.   Yes.
>
> Q.   Why would it -- why does it surprise you?  'Cause it
>      sounds expensive?
>
> A.   Yes.

313.   Likewise, the patient K.C. (Claim No. 011211690-008) provided the following testimony when he was asked about the charges for the tests, treatment, and services that he received from the Defendants and their associates:

Q.   Now, between transportation, the physical therapy,
     chiropractic treatment, and that Nervomatrix
     treatment, did you have -- do you have any idea how
     much they were charging USAA in one day for that
     treatment?

A.   No, I do not.

Q.   Do you have a guess?

A.   That information was never shared with me.

Q.   Okay.  Do you have a guess at how much they were
     charging?

A.   For physical therapy?

Q.   Yes, for transportation, physical therapy,
     chiropractic treatment, and the Nervomatrix machine.

A.   Three hundred a day.

Q.   All right.  What would you say if I told they were
     charging $7,267.50 per day?

A.   That -- that sounds unbelievable because they didn't
     provide that amount of services ever to me in one day.

Q.   And again, you testified earlier that you recall
     signing paperwork that said that if the insurance
     company didn't pay the bill that you may be personally
     responsible for that, correct?

A.   That is correct.

Q.   And had you known that that was the charge that they
     were going to have for that treatment, might you have
     looked for some other medical provider?

A.   Yes.

***

> Q.   And then I had mentioned to you earlier that my
>      records show that you had received 41 separate
>      sessions with the Nervomatrix machine, that's the
>      heating pad you described with the pins on it.
>
> A.   Yes.
>
> Q.   So what would your response be when I tell you that
>      they billed USAA for those 41 treatments $28,905?
>
> A.   To me that is -- it looks like they're way
>      overcharging USAA because I did not receive treatment
>      that should have cost nowhere near that.

314.   As such, the Defendants' charges for TPII and LINT treatment are grossly excessive.

## XI.   <u>EXEMPLAR CLAIMS</u>

### A.   <u>Claimant K.C. (Claim No. 011211690-008)</u>

315.   Claimant K.C. (Claim No. 011211690-008) was reportedly involved in a motor vehicle accident on February 20, 2022.

316.   Shortly after the purported motor vehicle accident, K.C. conducted an online search for physical therapy facilities and came across a search result for 1-800-PAIN.

317.   In connection with the search result, K.C. sought treatment at the Woodward Avenue Clinic and began a course of physical therapy treatment at Level

1 Physical Therapy to treat unspecified low back pain and a sprain of the sacroiliac joint.

318.   The Plaintiffs were billed by Select Medical Group for an initial evaluation that was purportedly performed by Ruan on March 8, 2022, who provided the necessary referral for physical therapy.

319.   Despite these minor soft tissue injuries, K.C. was placed on an excessive course of physical therapy at Level 1 Physical Therapy, which included the unnecessary therapeutic exercise, electric stimulation, hot/cold packs, and TPII/LINT treatment.

320.   Although Level 1 Physical Therapy submitted medical records and bills to the Plaintiffs for treatment that required direct (one-on-one) patient contact, K.C. testified that his exercise at Level 1 Physical Therapy included unattended therapeutic exercises.

321.   K.C. further testified that he selected the exercises and stretches to perform, as well as their duration, on each date of service at Level 1 Physical Therapy.

322.   On certain dates of service, K.C. testified that there could be as many as seven (7) or eight (8) other patients in the room receiving treatment; however, Level 1 Physical Therapy never billed the Plaintiffs for a single unit of group therapy.

323.   This course of treatment ultimately spanned 69 dates of service over more than seven (7) months, totaling $254,365.00.

324.   During this course of treatment, K.C. purportedly received TPII/LINT treatment on 34 separate dates of service, which represented $208,675.00 of the total charges submitted by Level 1 Physical Therapy to the Plaintiffs.

325.   In support of this excessive course of treatment, K.C. was re-evaluated at Select Medical Group on seven (7) dates of service, in which additional physical therapy referrals were generated to continue the course of treatment at Level 1 Physical Therapy.

326.   The Plaintiffs were billed more than $6,199.20 in connection with K.C.'s treatment at Select Medical Group.

327.   In furtherance of this scheme, K.C. - who had purchased a new motor vehicle after the February 20, 2022 accident and who resided only six (6) miles from the Woodward Avenue Clinic – was provided with transportation to the facility by Rent A Ride.

328.   K.C. testified that he was led to believe that he was required to utilize the Rent A Ride transportation service when attending the Woodward Avenue Clinic.

> Q.   So then is there a reason why you chose to use
>      transportation versus driving yourself to the doctor's
>      appointments?
> A.   They never provided me driving myself as an option.
> Q.   Okay.  So they told you you had to use their
>      transportation?
> A.   Correct.

329.   The transportation services purportedly provided by Rent A Ride spanned 161 separate rides, in which Rent A Ride submitted charges to the Plaintiffs in the amount of $125.00 for each ride, totaling $20,125.00.

330.   Notably, Rent A Ride submitted a bill to the Plaintiffs for roundtrip transportation that was purportedly provided to K.C. on May 24, 2022.

331.   However, K.C. did not receive any medical treatment on May 24, 2022.

332.   In connection with the services purportedly rendered on behalf of K.C., the Provider Defendants submitted false documentation to the Plaintiffs through the U.S. Mail.

333.   All of the Provider Defendants' billing to the Plaintiffs for K.C. was unlawful and fraudulent.

### B.   Claimant M.W. (Claim No. 038189916-004)

334.   Claimant M.W. (Claim No. 038189916-004) was reportedly involved in a motor vehicle accident on September 27, 2021.

335.   On September 30, 2021, only three (3) days after the reported motor vehicle accident, M.W. sought treatment at Select Medical Group, wherein he reported complaints of right shoulder, left hand, left knee, and neck pain.

336.   The Plaintiffs were billed by Select Medical Group for an initial evaluation that was purportedly performed by Ruan on September 30, 2021, who provided the necessary referral for physical therapy.

337.   M.W. subsequently began a course of physical therapy at Michigan First Rehab on October 6, 2021, which included the use of hot/cold packs, electric stimulation, manual therapy, therapeutic exercise, and TPII/LINT treatment.

338.   Despite his minor soft tissue injuries, M.W. underwent an excessive course of physical therapy at Michigan First Rehab that spanned 77 dates of service over seven (7) and a half months, totaling $315,072.50.

339.   During this excessive course of treatment, Michigan First Rehab purportedly rendered TPII/LINT treatment to M.W. on 43 separate dates of service, which represented $263,912.50 of the total charges submitted by Michigan First Rehab to the Plaintiffs.

340.   To support this excessive treatment, M.W. was re-evaluated by Ruan and Toweh on six (6) dates of service, which generated the physical therapy referrals necessary to continue this treatment.

341.   The Plaintiffs were billed $6,858.20 in connection with M.W.'s medical treatment at Select Medical Group.

342.   In connection with the treatment at the Greenfield Road Clinic and with the associated medical providers, Rent A Ride purportedly provided M.W. with 114 separate rides to and from his medical appointments at a rate of $125.00 per ride.

343.   The charges submitted to the Plaintiffs by Rent A Ride in connection with the purported transportation services for M.W. totaled $14,250.00.

344.   Notably, Rent A Ride submitted a bill to the Plaintiffs for roundtrip transportation that was purportedly provided to M.W. on October 5, 2021.

345.   However, M.W. did not receive medical treatment on October 5, 2021.

346.   In connection with the services purportedly rendered on behalf of M.W. the Provider Defendants submitted false documentation to the Plaintiffs through the U.S. Mail.

347.   All of the Provider Defendants' billing to the Plaintiffs for M.W. was unlawful and fraudulent.

**C.**   **Claimant O.R. (Claim No. 037004789-001)**

348.   Claimant O.R. (Claim No. 037004789-001) was reportedly involved in a motor vehicle accident on July 5, 2022.

349.   On August 11, 2022, O.R. sought treatment at Select Medical Group with complaints of headaches, mid neck pain, bilateral shoulder pain, mid back pain, and bilateral knee pain.

350.   The Plaintiffs were billed by Select Medical Group for an initial evaluation that was purportedly performed by Ruan on August 11, 2022, who provided the necessary referral for physical therapy.

351.   O.R. subsequently sought physical therapy treatment just over one (1) month later on September 15, 2022 at Michigan First Rehab.

352.   Although the initial evaluation at Michigan First Rehab occurred more than two (2) months after the date of loss, the Physical Therapy Initial Examination report notes that O.R. purportedly rated his neck, lower back, left shoulder, and left knee pain all as an 8/10.

353.   O.R. subsequently began a course of physical therapy at Michigan First Rehab on September 15, 2022, which included the use of therapeutic exercise, electric stimulation, hot/cold packs, and TPII/LINT treatment.

354.   Despite the minor soft tissue injuries, O.R. underwent an excessive course of physical therapy at Michigan First Rehab that spanned 51 dates of service over six (6) months, totaling $172,560.00.

355.   During this course of treatment, Michigan First Rehab purportedly rendered TPII/LINT treatment to O.R. on 24 separate dates of service, representing $147,300.00 of the total charges submitted by Michigan First Rehab to the Plaintiffs.

356.   In connection with O.R.'s treatment at the Greenfield Road Clinic and the associated medical providers, Rent A Ride purportedly provided O.R. with 86 separate rides to and from his medical appointments.

357.   In each case, Rent A Ride submitted a charge of $125.00 to the Plaintiffs, despite the fact that O.R.'s residence was located approximately five (5) miles from the Greenfield Road Clinic.

358.   The charges submitted to the Plaintiffs by Rent A Ride in connection with the purported transportation services for O.R. totaled $10,750.00.

359.   Notably, Rent A Ride submitted a bill to the Plaintiffs for roundtrip transportation that was purportedly provided to O.R. on March 17, 2023.

360.   However, O.R. did not receive medical treatment on March 17, 2023.

361.   In connection with the services purportedly rendered on behalf of O.R., the Provider Defendants submitted false documentation to the Plaintiffs through the U.S. Mail.

362.   All of the Provider Defendants' billing to the Plaintiffs for O.R. was unlawful and fraudulent.

## D.    Claimant A.B. (Claim No. 029273038-010)

363.    Claimant A.B. (Claim No. 029273038-010) reported that he sought treatment at Select Medical Group after a motor vehicle accident that occurred on April 12, 2022.

364.    The Plaintiffs were billed by Select Medical Group for an initial evaluation that was purportedly performed by Ruan on August 17, 2022, who provided the necessary referral for physical therapy.

365.    Although A.B. received the referral for physical therapy, he did not immediately seek such treatment.

366.    A.B. testified that he subsequently received a telephone call in which he was advised that transportation would be provided on a specific date and time to transport him for additional treatment.

367.    On that date, A.B. was transported to Level 1 Physical Therapy where he was provided with information regarding the hiring of an attorney before undergoing an initial evaluation.

368.    As a result of the initial evaluation, A.B. was placed on a course of physical therapy treatment, which included therapeutic exercise, electric stimulation, manual therapy, hot/cold packs, and TPII/LINT treatment.

369.   In light of his soft tissue injuries and the nature of this treatment, A.B. testified that he subsequently stopped treating with the Defendants, as he suspected that they were using his injuries to generate profits for themselves.

> A.   I stopped going there last month.  And I think they had
>      appointment for me this month, but I didn't go because I
>      was -- these people just making money off of me for
>      nothing.  I'm going down -- all they was doing this --
>      playing games; that's why I stop.  I didn't go -- I
>      didn't go this month.

370.   Although A.B.'s treatment at Level 1 Physical Therapy lasted only nine (9) dates of service, which included eight (8) dates of TPII/LINT treatment, the Plaintiffs were billed more than $54,400.00 by Level 1 Physical Therapy, and $6,749.00 by Select Medical Group.

371.   In connection with the services purportedly rendered on behalf of A.B., the Provider Defendants submitted false documentation to the Plaintiffs through the U.S. Mail.

372.   All of the Provider Defendants' billing to the Plaintiffs for A.B. was unlawful and fraudulent.

### E.   Claimant Z.B. (Claim No. 003340911-080)

373.   Claimant Z.B. (Claim No. 003340911-080) was reportedly involved in a motor vehicle accident on September 30, 2023.

374.   The Plaintiffs were billed by Select Medical Group for an initial evaluation that was purportedly performed by Toweh on October 5, 2023, who provided the necessary referral for physical therapy.

375.   As a result of the initial evaluation, Z.B., an otherwise healthy 20 year-old, was diagnosed with cervicalgia (i.e., neck pain), cervicogenic headache, muscle spasm, impingement of the right shoulder, lower back strain, and a sprain of the sacroiliac joint.

376.   Despite these soft tissue injuries, Z.B. began an excessive course of physical therapy at Level 1 Physical Therapy on the following day, October 6, 2023, which included therapeutic exercise, electric stimulation, hot/cold packs, and TPII/LINT treatment.

377.   This excessive course of physical therapy ultimately spanned over six (6) months to April 19, 2024, totaling $157,780.00.

378.   During this course of treatment, Z.B. purportedly received TPII/LINT treatment on 22 separate dates of service, representing $134,200.00 of the total charges submitted by Level 1 Physical Therapy to the Plaintiffs.

379.   To support this excessive course of physical therapy, Z.B. was re-evaluated on five (5) occasions by Ruan and Toweh at Select Medical Group, who provided the physical therapy referrals necessary to continue this treatment.

380. The Plaintiffs were billed over $6,454.20 in connection with Z.B.'s treatment at Select Medical Group.

381. In connection with the services purportedly rendered on behalf of Z.B., the Provider Defendants submitted false documentation to the Plaintiffs through the U.S. Mail.

382. All of the Provider Defendants' billing to the Plaintiffs for Z.B. was unlawful and fraudulent.

**F.** **Claimant W.L. (Claim No. 039648395-003)**

383. Claimant W.L. (Claim No. 039648395-003) was reportedly involved in a motor vehicle accident on December 12, 2020.

384. W.L. subsequently sought treatment at Select Medical Group on December 22, 2020 with reports of headaches and neck and lower back pain.

385. The Plaintiffs were billed by Select Medical Group for an initial evaluation that was purportedly performed by Ruan on December 22, 2020, who provided the necessary referral for physical therapy.

386. The Select Medical Group initial evaluation report indicates that W.L. was diagnosed with soft tissue injuries, consisting of neck pain, myofascial pain, lower back pain, right SI joint pain, and headaches.

387.   On December 30, 2020, W.L. began treating at Level 1 Physical Therapy, which included therapeutic exercises, electric stimulation, hot/cold packs, manual therapy, and TPII/LINT treatment.

388.   This excessive course of physical therapy subsequently spanned 89 dates of service over almost 11 months, totaling $164,557.50.

389.   During that time, W.L. was purportedly received TPII/LINT treatment on 15 separate dates, which were billed to the Plaintiffs at a rate of $6,137.50 for each treatment.

390.   The Plaintiffs were billed $92,062.50 by Level 1 Physical Therapy for the TPII/LINT treatment that was purportedly rendered to W.L.

391.   To justify this excessive course of treatment, W.L. was re-evaluated by Ruan and Toweh at Select Medical Group on eight (8) separate occasions, who provided the subsequent physical therapy referrals to continue the treatment at Level 1 Physical Therapy.

392.   The Plaintiffs were billed $5,060.00 by Select Medical Group in connection with the treatment that was purportedly provided to W.L.

393.   In conjunction with W.L.'s treatment with these Provider Defendants, W.L. purportedly received 286 separate rides to and from her medical appointments through Rent A Ride.

394.   In each instance, Rent A Ride submitted a bill to the Plaintiffs in the amount of $125.00 despite transporting W.L. only 13 miles from her residence to the Woodward Avenue Clinic.

395.   Rent A Ride billed the Plaintiffs more than $35,750.00 for the transportation services that were purportedly provided to W.L.

396.   Notably, these bills included charges for roundtrip transportation that was purportedly provided on October 27, 2021.

397.   However, W.L. did not receive medical treatment on October 27, 2021.

398.   In connection with the services purportedly rendered on behalf of W.L., the Provider Defendants submitted false documentation to the Plaintiffs through the U.S. Mail.

399.   All of the Provider Defendants' billing to the Plaintiffs for W.L. was unlawful and fraudulent.

### G.   Claimant R.F. (Claim No. 042003798-002)

400.   Claimant R.F. (Claim No. 042003798-002) was purportedly involved in a motor vehicle accident on June 8, 2018.

401.   The medical records and bills submitted to the Plaintiffs indicate that R.F. sought treatment on the date of the loss at Mercyland Health Services, PLLC ("Mercyland") and subsequently began treating with Level 1 Physical Therapy on June 14, 2018.

402.   In connection with this treatment at Mercyland, Level 1 Physical Therapy, R.F. purportedly received transportation services to and from his appointments from Rent A Ride.

403.   The Plaintiffs have been billed $5,980.00 by Rent A Ride for transportation services that were purportedly provided to R.F. over the course of 52 separate rides.

404.   However, the bills submitted to the Plaintiffs by Rent A Ride include charges for 16 separate dates of roundtrip transportation that predate R.F.'s purported June 8, 2018 motor vehicle accident.

405.   Specifically, the Plaintiffs have received roundtrip charges from Rent A Ride for dates of service between February 15, 2018 and April 23, 2018.

406.   To date, the Plaintiffs have not received any medical bills nor records to demonstrate that R.F. received medical treatment on any of these 16 dates of service.

407.   In connection with the services purportedly rendered on behalf of R.F., the Provider Defendants submitted false documentation to the Plaintiffs through the U.S. Mail.

408.   All of the Provider Defendants' billing to the Plaintiffs for R.F. was unlawful and fraudulent.

### H.    Claimant C.H. (Claim No. 037439267-012)

409.    Claimant C.H. (Claim No. 037439267-012) was reportedly involved in a motor vehicle accident on November 2, 2021.

410.    The Plaintiffs were billed by Select Medical Group for an initial evaluation that was purportedly performed by Ruan on November 16, 2021, who provided the necessary referral for physical therapy.

411.    The Select Medical Group initial evaluation report indicates that C.H. was diagnosed with soft tissue injuries, consisting of lower back pain, bilateral sacroiliac joint pain, pain in both shoulders, and pain in both knees.

412.    C.H. subsequently began a course of physical therapy at Level 1 Physical Therapy on November 22, 2021.

413.    The Level 1 Physical Therapy medical records indicate that C.H. was placed on Level 1 Physical Therapy's predetermined protocol of therapeutic exercises, hot/cold packs, dynamic therapeutic activities, ultrasound, electrical stimulation, manual therapy, and TPII/LINT treatment.

414.    Notably, the treatment purportedly rendered to C.H. at Level 1 Physical Therapy included 32 separate dates of service for TPII/LINT treatment, totaling $196,400.00.

415.    Despite C.H.'s minor, soft tissue injuries, Level 1 Physical Therapy billed the Plaintiffs more than $243,605.00 for the alleged treatment of C.H. pursuant

to this predetermined protocol, which spanned more than seven (7) and a half months.

416.   To justify the predetermined treatment protocol, C.H. was purportedly re-evaluated by Ruan and Toweh at Select Medical on 15 separate dates, who inevitably provided the necessary physical therapy referrals to continue this treatment.

417.   The Plaintiffs were billed $7,350.00 by Select Medical Group in connection with the treatment that was purportedly rendered to C.H.

418.   In conjunction with the treatment at Level 1 Physical Therapy and Select Medical Group, C.H. purportedly received 264 separate rides through Rent A Ride, which were billed to the Plaintiffs at a rate of $125.00 per ride.

419.   Rent A Ride ultimately billed the Plaintiffs $33,000.00 for the transportation services that were purportedly provided to C.H.

420.   In connection with the services purportedly rendered on behalf of C.H., the Provider Defendants submitted false documentation to the Plaintiffs through the U.S. Mail.

421.   All of the Provider Defendants' billing to the Plaintiffs for C.H. was unlawful and fraudulent.

## I.    **Claimant E.J. (Claim No. 013811649-082)**

422.    Claimant E.J. (Claim No. 013811649-082) was reportedly involved in a motor vehicle accident on April 14, 2023.

423.    On May 4, 2023, E.J. sought treatment at Michigan First Rehab and was subsequently placed on a course of physical therapy treatment that included therapeutic exercise, therapeutic activity, hot/cold packs, neuromuscular reeducation, and TPII/LINT treatment.

424.    In contravention of Mich. Comp. Laws § 333.17820(1), E.J. continued to treat at Michigan First Rehab for well over 21 days and 10 visits before being evaluated by Ruan at Select Medical Group on August 1, 2023.

425.    Notably, E.J.'s course of physical therapy at Michigan First Rehab spanned 22 dates of service over the course of approximately three (3) and a half months.

426.    During this period, E.J. purportedly received 17 separate dates of TPII/LINT treatment at Michigan First Rehab.

427.    The Plaintiffs were subsequently billed more than $91,810.00 for the treatment that Michigan First Rehab purportedly rendered to E.J.

428.    In connection with the services purportedly rendered on behalf of E.J., the Provider Defendants submitted false documentation to the Plaintiffs through the U.S. Mail.

429.   All of the Provider Defendants' billing to the Plaintiffs for E.J. was unlawful and fraudulent.

**J.**      **Claimant A.L. (Claim No. 039648395-003)**

430.   Claimant A.L. (Claim No. 039648395-003) was reportedly involved in a motor vehicle accident on December 12, 2020.

431.   The Plaintiffs were billed by Select Medical Group for an initial evaluation that was purportedly performed by Ruan on December 21, 2020, who provided the necessary referral for physical therapy.

432.   The Select Medical Group initial evaluation record indicates that A.L. was diagnosed with soft tissue injuries consisting of cervicalgia, muscle spasm, low back pain, and myalgia, unspecified site, and referred A.L. for physical therapy.

433.   The medical records and bills submitted to the Plaintiffs by Level 1 Physical Therapy indicate that A.L. began a course of therapy on December 30, 2020.

434.   A.L. was subsequently placed on Level 1 Physical Therapy's excessive predetermined treatment protocol, which included therapeutic exercises, hot/cold packs, dynamic therapeutic activities, ultrasound, electrical stimulation, manual therapy, mechanical traction, and TPII/LINT treatment.

435.   Despite the soft tissue injuries, A.L.'s course of treatment at Level 1 Physical Therapy ultimately spanned nearly 11 months over 97 dates of service, totaling $179,565.00.

436.   During this course of treatment, A.L. purportedly received TPII/LINT treatment on 16 separate dates, representing $98,200.00 of the total charges submitted to the Plaintiffs by Level 1 Physical Therapy.

437.   To justify this excessive treatment, A.L. was re-evaluated by Ruan and Toweh at Select Medical Group on seven (7) separate dates, who provided the physical therapy referrals to continue this course of treatment.

438.   Throughout the course of treatment at Level 1 Physical Therapy and Select Medical Group, A.L. was provided with transportation services through Rent A Ride comprising 305 separate trips.

439.   In each case, Rent A Ride submitted a bill to the Plaintiffs in the amount of $125.00 per trip, despite A.L. residing less than 13 miles from the Woodward Avenue Clinic, and 16 miles from the Greenfield Road Clinic.

440.   The Plaintiffs were subsequently billed $6,504.00 by Select Medical Group and $38,125.00 by Rent A Ride for the tests, treatment, and services that were purportedly provided to A.L.

441.   In connection with the services purportedly rendered on behalf of A.L., the Provider Defendants submitted false documentation to the Plaintiffs through the U.S. Mail.

442.   All of the Provider Defendants' billing to the Plaintiffs for A.L. was unlawful and fraudulent.

**K.    Claimant E.F. (Claim No. 035798180-029)**

443.   Claimant E.F. (Claim No. 035798180-029) was reportedly involved in a motor vehicle accident on June 3, 2019.

444.   E.F. was subsequently seen hours later at the Royal Oak Hospital Emergency Room wherein he had complaints of neck and back pain.

445.   An examination in the Emergency Room that included x-rays ultimately resulted in a diagnosis of left sided neck spasm/pain.

446.   The Plaintiffs were billed by Select Medical Group for an initial evaluation that was performed by Nada Sareini, MSN ("Sareini") on June 6, 2019.

447.   Despite the limited prior findings at the Royal Oak Hospital pertaining to E.F.'s neck, the Select Medical Group initial evaluation report indicates that E.F. purportedly had complaints of right and left hip pain rated 8/10, and lower back pain, which was rated 9/10.

448.   The medical records submitted to the Plaintiffs by Select Medical Group indicate that Sareini provided the necessary referral for physical therapy.

449.   On June 11, 2019, eight (8) days after the reported motor vehicle accident, E.F. presented at Level 1 Physical Therapy.

450.   The medical records submitted to the Plaintiffs by Level 1 Physical Therapy note that E.F. had purported complaints of pain in the neck, lower back, right hip, and left hip.

451.   Although E.F. had previously been diagnosed with only a left sided neck spasm at the Royal Oak Hospital, the Level 1 Physical Therapy initial evaluation report noted that E.F., an otherwise healthy 26 year-old, purportedly rated the pain in his neck, right hip, left hip, and lower back each as 10/10 at their worst, 9/10 at their best, and 9/10 at the time of the evaluation.

452.   In light of these exaggerated findings, Level 1 Physical Therapy placed E.F. on a course of medically unnecessary physical therapy treatment, which consisted of therapeutic exercise, hot/cold packs, electric stimulation, manual therapy, and neuromuscular reeducation.

453.   In furtherance of this scheme and to justify this excessive course of physical therapy, E.F. was re-evaluated by Ruan and Toweh on five (5) additional occasions, who in turn provided the physical therapy referrals necessary to continue this treatment.

454.   As evidenced by patient E.F., these exaggerated findings recorded by Select Medical Group and Level 1 Physical Therapy were utilized to justify an excessive course of physical therapy to treat minor soft-tissue injuries.

455.   This excessive treatment ultimately continued to December 13, 2019, just over six (6) months from the date of the initial evaluation, totaling $20,950.00.

456.   In connection with this treatment, the Plaintiffs also received bills from Rent A Ride, demonstrating that E.F. was provided with transportation to both the Woodward Avenue Clinic and Greenfield Road Clinic.

457.   In connection with the services purportedly rendered on behalf of E.F., the Provider Defendants submitted false documentation to the Plaintiffs through the U.S. Mail.

458.   All of the Provider Defendants' billing to the Plaintiffs for E.F. was unlawful and fraudulent.

**L.    Claimants E.M. (Claim No. 036118030-002); B.G. (Claim No. 033734841-009); and Y.M. (Claim No. 043260595-013)**

459.   Rent A Ride billed the Plaintiffs for roundtrip transportation for the Claimant B.G. (Claim No. 033734841-009) on January 25, 2019, January 28, 2019, January 30, 2019, February 1, 2019, February 6, 2019, February 8, 2019, February 11, 2019, February 13, 2019, March 29, 2019, April 5, 2019, April 8, 2019, April 10, 2019, and April 12, 2019.

460.   However, B.G. did not receive any medical treatment on January 25, 2019, January 28, 2019, January 30, 2019, February 1, 2019, February 6, 2019, February 8, 2019, February 11, 2019, February 13, 2019, March 29, 2019, April 5, 2019, April 8, 2019, April 10, 2019, or April 12, 2019.

461.   Likewise, for Claimant Y.M. (Claim No. 043260595-013), Rent A Ride billed the Plaintiffs for round trip transportation on March 14, 2021, March 25, 2021, March 31, 2021, October 12, 2021, October 22, 2021, November 5, 2021, December 3, 2021, February 15, 2022, and July 2, 2022.

462.   However, Y.M. did not receive any medical treatment on March 14, 2021, March 25, 2021, March 31, 2021, October 12, 2021, October 22, 2021, November 5, 2021, December 3, 2021, February 15, 2022, or July 2, 2022.

463.   Similarly, Rent A Ride billed the Plaintiffs for roundtrip transportation for the Claimant E.M. (Claim No. 036118030-002) on October 2, 2018, October 3, 2018, and October 8, 2018.

464.   However, E.M. never received medical treatment on October 2, 2018, October 3, 2018, or October 8, 2018.

465.   In connection with the transportation services purportedly rendered on behalf of B.G., Y.M., and E.M., Rent A Ride submitted false documentation to the Plaintiffs through the U.S. Mail.

466.   Rent A Ride's bills to the Plaintiffs for E.M., B.G., and Y.M. were unlawful and fraudulent.

## XII.   SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY

467.   Throughout the course of this entire scheme, the Defendants (a) created, prepared, and submitted (or caused to be created, prepared, and submitted) false medical documentation, (b) intentionally violated the laws of the United States by devising, and intending to devise, schemes to defraud and obtain money and property by means of false and fraudulent pretenses in representations, and (c) placed, or caused to be placed, in a post office and/or authorized depository for mail matter, things to be sent and delivered by the United States Postal Service, in violation of 18 U.S.C. § 1341 (mail fraud) for the purpose of executing, or attempting, such fraudulent schemes.

468.   Unless otherwise pled to the contrary, all documents, notes, reports, prescriptions, health insurance claim forms, letters, and invoices in connection with the insurance claims referenced throughout this pleading traveled though the U.S. Mail.

469.   Every automobile insurance claim detailed within this Complaint involved at least two uses of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, claim-related

payments, and the return of the cancelled payment instruments to the financial institution(s) from which the draft(s) were drawn.

470.   The Defendants either personally used (or caused the use of) the U.S. Mail to further this fraudulent scheme by causing patient medical records, prescriptions, bills, invoices, and other No-Fault claim documents from the Provider Defendants to be mailed to the Plaintiffs, or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

**A.** **Level 1 Health Systems of Michigan, LLC d/b/a Level 1 Physical Therapy Enterprise**

471.   Sabah Dehko, Select Medical Group, Toweh, Norman Dehko, Rent A Ride, Somerset Auto, and 1-800-PAIN personally used the U.S. Mail (or caused the U.S. Mail to be used) to further the fraudulent scheme by causing medical bills and records from Level 1 Physical Therapy to be mailed to the Plaintiffs and/or counsel for parties, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

472.   The Defendants (and/or other persons working at their discretion and/or on their behalf) caused Level 1 Physical Therapy to submit false medical documentation to the Plaintiffs each time that Level 1 Physical Therapy mailed a demand for payment (i.e., invoice) to the Plaintiffs.

473.   The Defendants committed mail fraud through Level 1 Physical Therapy by submitting fraudulent claims to the Plaintiffs as the claims contain

billing for tests, treatment, and services that were (1) not rendered; (2) medically unnecessary and pursuant to a predetermined treatment protocol; (3) fraudulently billed; and/or (4) not lawfully rendered.

474.   The Defendants (and/or other persons working at their discretion and/or on their behalf) purposely caused Level 1 Physical Therapy to make a misrepresentation each and every time that they mailed a document to the Plaintiffs claiming eligibility for No-Fault reimbursement.

475.   At all relevant times, the Defendants knew that Level 1 Physical Therapy, a patient, a claimant, an insurance carrier, patient's attorney, other medical provider, and/or the Plaintiffs would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Level 1 Physical Therapy.

476.   The Plaintiffs estimate that the unlawful operation of the Level 1 Physical Therapy enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 6 and incorporated by reference as if set forth in its entirety.

### B.   Michigan First Rehab, LLC Enterprise

477.   Jordan Dehko, Select Medical Group, Toweh, Norman Dehko, Rent A Ride, Somerset Auto, and 1-800-PAIN personally used the U.S. Mail (or caused the U.S. Mail to be used) to further the fraudulent scheme by causing medical bills and

records from Michigan First Rehab to be mailed to the Plaintiffs and/or counsel for parties, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

478.   The Defendants (and/or other persons working at their discretion and/or on their behalf) caused Michigan First Rehab to submit false medical documentation to the Plaintiffs each time that Michigan First Rehab mailed a demand for payment (i.e., invoice) to the Plaintiffs.

479.   The Defendants committed mail fraud through Michigan First Rehab by submitting fraudulent claims to the Plaintiffs as the claims contain billing for tests, treatment, and services that were (1) not rendered; (2) medically unnecessary and pursuant to a predetermined treatment protocol; (3) fraudulently billed; and/or (4) not lawfully rendered.

480.   The Defendants (and/or other persons working at their discretion and/or on their behalf) purposely caused Michigan First Rehab to make a misrepresentation each and every time that they mailed a document to the Plaintiffs claiming eligibility for No-Fault reimbursement.

481.   At all relevant times, the Defendants knew that Michigan First Rehab, a patient, a claimant, an insurance carrier, patient's attorney, other medical provider, and/or the Plaintiffs would use (or be caused to use) the U.S. Mail in connection with

each of the fraudulent claims, including issuing payments based upon documentation mailed by Michigan First Rehab.

482. The Plaintiffs estimate that the unlawful operation of the Michigan First Rehab enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 6 and incorporated by reference as if set forth in its entirety.

## C. Select Medical Group of Michigan PLLC d/b/a Select Medical Group of Michigan, PLLC Enterprise

483. Toweh, Sabah Dehko, Level 1 Physical Therapy, Jordan Dehko, Michigan First Rehab, Norman Dehko, Rent A Ride, Somerset Auto, and 1-800-PAIN personally used the U.S. Mail (or caused the U.S. Mail to be used) to further the fraudulent scheme by causing medical bills and records from Select Medical Group to be mailed to the Plaintiffs and/or counsel for parties, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

484. The Defendants (and/or other persons working at their discretion and/or on their behalf) caused Select Medical Group to submit false medical documentation to the Plaintiffs each time that Select Medical Group mailed a demand for payment (i.e., invoice) to the Plaintiffs.

485. The Defendants committed mail fraud through Select Medical Group by submitting fraudulent claims to the Plaintiffs as the claims contain billing for

tests, treatment, and services that were (1) not rendered; (2) medically unnecessary and pursuant to a predetermined treatment protocol; (3) fraudulently billed; and/or (4) not lawfully rendered.

486.   The Defendants (and/or other persons working at their discretion and/or on their behalf) purposely caused Select Medical Group to make a misrepresentation each and every time that they mailed a document to the Plaintiffs claiming eligibility for No-Fault reimbursement.

487.   At all relevant times, the Defendants knew that Select Medical Group, a patient, a claimant, an insurance carrier, patient's attorney, other medical provider, and/or the Plaintiffs would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Select Medical Group.

488.   The Plaintiffs estimate that the unlawful operation of the Select Medical Group enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 6 and incorporated by reference as if set forth in its entirety.

### D.   Dehko Investment, Inc. d/b/a Rent A Ride of Detroit Enterprise

489.   Norman Dehko, Sabah Dehko, Level 1 Physical Therapy, Jordan Dehko, Michigan First Rehab, Toweh, Select Medical Group, Somerset Auto, and 1-800-PAIN personally used the U.S. Mail (or caused the U.S. Mail to be used) to

further the fraudulent scheme by causing transportation bills and records from Rent A Ride to be mailed to the Plaintiffs and/or counsel for parties, and/or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

490.   The Defendants (and/or other persons working at their discretion and/or on their behalf) caused Rent A Ride to submit false medical documentation to the Plaintiffs each time that Rent A Ride mailed a demand for payment (i.e., invoice) to the Plaintiffs.

491.   The Defendants committed mail fraud through Rent A Ride by submitting fraudulent claims to the Plaintiffs as the claims contain billing for services that were (1) not rendered; (2) medically unnecessary and pursuant to a predetermined treatment protocol; (3) fraudulently billed; and/or (4) not lawfully rendered.

492.   The Defendants (and/or other persons working at their discretion and/or on their behalf) purposely caused Rent A Ride to make a misrepresentation each and every time that they mailed a document to the Plaintiffs claiming eligibility for No-Fault reimbursement.

493.   At all relevant times, the Defendants knew that Rent A Ride, a patient, a claimant, an insurance carrier, patient's attorney, other medical provider, and/or the Plaintiffs would use (or be caused to use) the U.S. Mail in connection with each

of the fraudulent claims, including issuing payments based upon documentation mailed by Rent A Ride.

494.   The Plaintiffs estimate that the unlawful operation of the Rent A Ride enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 6 and incorporated by reference as if set forth in its entirety.

## XIII. <u>MISREPRESENTATIONS MADE BY THE DEFENDANTS</u>

495.   Claims for medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation." Mich. Comp. Laws § 500.3107(1)(a).

496.   Moreover, claims for medical benefits under Michigan's No-Fault Act can only be made for services that are "lawfully render[ed]." Mich. Comp. Laws § 500.3157(1).

497.   Thus, every time the Defendants submitted bills and medical records to the Plaintiffs supporting their claims for No-Fault payments, the Defendants necessarily warranted that such bills and records related to lawfully and actually rendered and necessary treatment for their patients' care, recovery, or rehabilitation.

498.   If treatment is not required for a patient's care, recovery, or rehabilitation, such treatment is not medically necessary.

113

499.   The Defendants made material misrepresentations of fact, including billing for services not rendered, unlawfully soliciting patients, paying kickbacks, falsifying documents to justify excessive treatment and improper referrals, using a predetermined treatment protocol to inflate charges, and misrepresenting the necessity of treatment and testing on submitted bills.

500.   Indeed, the Provider Defendants attested to the necessity of the tests, treatment, and services that they allegedly rendered as well as the validity of the charges for such services.

501.   Moreover, each Health Insurance Claim Form (known as the "CMS-1500" form and formerly known as the "HCFA-1500" form) submitted to the Plaintiffs by the Defendants contained the following notation: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

502.   Through the submission of patient records, invoices, CMS-1500 forms, and other medical documentation to the Plaintiffs via the U.S. Mail, the Defendants attested to the fact, lawfulness, and medical necessity of the tests, treatment, and services for which they billed the Plaintiffs.

503.   As the Defendants did not render lawful and reasonably necessary tests, treatment, and services, and misrepresented the tests, treatment, and services

purportedly performed, each bill and accompanying documentation mailed by or on behalf of the Defendants to the Plaintiffs constitutes a material misrepresentation.

## XIV. <u>FRAUDULENT CONCEALMENT</u>

504. The Defendants' purposeful concealment of the Provider Defendants' lack of eligibility for No-Fault reimbursement allowed the scheme to continue undetected.

505. At all relevant times, the Defendants concealed from the Plaintiffs facts regarding the lawfulness and medical necessity of the services allegedly provided to the Plaintiff' claimants to prevent the Plaintiffs from discovering that the claims submitted by, and on behalf of, the Defendants were not compensable under Michigan's No-Fault laws.

506. For example, the Defendants undertook steps to prevent detection of this scheme by causing the Provider Defendants to operate as seemingly separate enterprises to conceal the volume of billing to the Plaintiffs.

507. In actuality, each of the Defendants were intertwined and crucial to the operation and control of the Provider Defendants in furtherance of this scheme.

508. The Defendants have also attempted to conceal the extent of their interrelationships to avoid detection.

509. On July 24, 2023, Norman Dehko lied to the Plaintiffs' investigators in an effort to fraudulently conceal his identity.

510.   Norman Dehko has identified himself as "Bob" to the Plaintiffs' investigators and claimants to conceal his presence and control over the Woodward Avenue Clinic.

511.   Despite previously testifying that he has heard of 1-800-PAIN on the radio, Sabah Dehko had no issue in providing a complete overview of 1-800-PAIN – which he admitted was owned by his father (i.e., Norman Dehko) – when interviewed by a social media influencer (i.e., "The Watch Guy", Ziv Tamir).

512.   Sabah Dehko has previously testified that he has never heard of Rent A Ride, however, the Transportation Network Company, Limousine Carrier or Taxicab Carrier application completed by Jordan Dehko on behalf of Rent A Ride identifies Sabah Dehko as an Agent of the business, which is owned by his father.

513.   Sabah Dehko has further lied during a deposition conducted by the Plaintiffs, wherein he testified that he was unaware as to whether his father, Norman Dehko, was the owner of Dehko Investment, Inc. and testified that Level 1 Physical Therapy had no relationship with Somerset Auto.

514.   As discussed above, Level 1 Physical Therapy's website and Instagram page advertised the telephone number for Somerset Auto (i.e., (313) 341-4444 in connection with free transportation for patients of Level 1 Physical Therapy.

515. In light of this testimony, it is clear that the Defendants have gone to great lengths, including committing perjury, to hide the true extent of their interrelationships and the nature of their fraud scheme.

516. Many of the unlawful acts are not readily evidenced within the four corners of documentation submitted to the Plaintiffs by the Defendants and upon which the Plaintiffs relied in adjusting the claims and tendering payment in connection with each discrete patient claim.

517. Evidence of the fraudulent scheme detailed in this Complaint was not discovered until after patterns had emerged and the Plaintiffs began to investigate the Defendants, revealing the true nature and full scope of their fraudulent scheme.

518. Due to the Defendants' material misrepresentations and other affirmative acts designed to conceal their fraudulent scheme, the Plaintiffs did not and could not have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## XV. **THE PLAINTIFFS' JUSTIFIABLE RELIANCE**

519. In reliance on the Defendants' misrepresentations, the Plaintiffs paid money to the Defendants to its detriment.

520. To induce the Plaintiffs to pay the fraudulent charges for tests, treatment, and services billed by Select Medical Group, Level 1 Physical Therapy,

Michigan First Rehab, and Rent A Ride, the Defendants hired attorneys and law firms to pursue collection of the fraudulent charges to the Plaintiffs.

521. These attorneys and law firms routinely file time-consuming and expensive lawsuits against the Plaintiffs in the event that the Provider Defendants' charges are not paid in full.

522. The facially valid documents submitted to the Plaintiffs by the Provider Defendants in support of the fraudulent charges, combined with the material misrepresentations described above, were designed to, and did, cause the Plaintiffs to justifiably rely on them.

523. The Defendants concealed from the Plaintiffs the truth regarding the Provider Defendants' reimbursement eligibility.

524. The Plaintiffs would not have paid the monies identified in Section XVI had the Defendants provided true and accurate information about the fact, lawfulness, and necessity of the referrals and medical services provided.

## XVI. **DAMAGES**

525. The Defendants' pattern of fraudulent conduct injured the Plaintiffs in their business and property by reason of the aforesaid violations of state and federal law. Although it is not necessary for the Plaintiffs to calculate its damages with specificity at this stage of the litigation (whereas the Plaintiffs' damages continue to

accrue), the Plaintiffs' injuries include, but are not limited to, compensatory damages for:

a)  Payments made to Level 1 Physical Therapy in connection with No-Fault benefit claims totaling $437,079.15, the exact amount to be determined at trial.  The chart annexed at Exhibit 7, and incorporated herein as if set forth in its entirety, identifies The Plaintiffs' payments to Level 1 Physical Therapy in connection with No-Fault benefit claims determined to be fraudulent as of the filing of this complaint.

b)  Payments made to Michigan First in connection with No-Fault benefit claims totaling $256,445.31, the exact amount to be determined at trial. The chart annexed at Exhibit 8, and incorporated herein as if set forth in its entirety, identifies The Plaintiffs' payments to Michigan First in connection with No-Fault benefit claims determined to be fraudulent as of the filing of this complaint.

c)  Payments made to Select Medical Group in connection with No-Fault benefit claims totaling $36,758.64, the exact amount to be determined at trial.  The chart annexed at Exhibit 9, and incorporated herein as if set forth in its entirety, identifies The Plaintiffs' payments to Select Medical Group in connection with No-Fault benefit claims determined to be fraudulent as of the filing of this complaint.

d) Payments made to Rent A Ride in connection with No-Fault benefit claims totaling $97,156.08, the exact amount to be determined at trial. The chart annexed at Exhibit 10, and incorporated herein as if set forth in its entirety, identifies The Plaintiffs' payments to Rent A Ride in connection with No-Fault benefit claims determined to be fraudulent as of the filing of this complaint.

## XVII. <u>CAUSES OF ACTION</u>

<u>COUNT I</u>
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Level 1 Health Systems of Michigan, LLC Enterprise)**
**Against Sabah Dehko, Select Medical Group of Michigan PLLC d/b/a Select Medical Group of Michigan, PLLC, Pedro Toweh, M.D., Norman Dehko, Dehko Investment, Inc. d/b/a Rent A Ride of Detroit, Somerset Auto Body of MI, Inc., and Lincoln International LLC/1-800-PAIN-800**

526.   The Plaintiffs re-allege, re-plead, and incorporate by reference paragraphs 1 through 525 set forth above as if fully set forth herein.

527.   In furtherance of their operation Level 1 Health Systems of Michigan, LLC d/b/a Level 1 Physical Therapy ("Level 1 Physical Therapy"), Defendants, Sabah Dehko, Select Medical Group of Michigan PLLC d/b/a Select Medical Group of Michigan, PLLC, Pedro Toweh, M.D., Norman Dehko, Dehko Investment, Inc. d/b/a Rent A Ride of Detroit, Somerset Auto Body of MI, Inc., and Lincoln International LLC/1-800-PAIN-800 (collectively, "Count I Defendants") intentionally prepared and mailed (or caused to be prepared and mailed) false

120

medical documentation in connection with the Plaintiffs' insurance claims in furtherance of their scheme to defraud.

528.   The Count I Defendants employed two or more mailings to demand and/or receive payment from the Plaintiffs on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 6.

529.   Among other things, Health Insurance Claim forms, physical therapy referrals, medical billing invoices, reports and notes, applications for insurance, and premium checks were routinely delivered to the Plaintiffs through the U.S. Mail.

530.   Policies of insurance were delivered to insureds through the U.S. Mail.

531.   Payments made by the Plaintiffs to the Count I Defendants were delivered through the U.S. Mail.

532.   As documented above, the Count I Defendants repeatedly and intentionally submitted, or caused to be submitted, Health Insurance Claim forms to the Plaintiffs related to services that were purportedly performed by the Provider Defendants for the purpose of collecting payment from the Plaintiffs under the Personal Injury Protection benefits portion of the Plaintiffs' policies and applicable Michigan No-Fault laws.

533.   As a result of, and in reasonable reliance upon, the mailing of these materially false representations, the Plaintiffs, by their agents and employees, issued

drafts to the Provider Defendants, for the benefit of one or more of the Count I Defendants, that would not otherwise have been paid.

534. The Count I Defendants' pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents, each appearing legitimate on their face, also prevented the Plaintiffs from discovering this scheme for a long period of time, thus enabling the Count I Defendants to continue without being detected.

535. The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

536. By creating and then mailing to the Plaintiffs (or directing the creation and subsequent mailing to the Plaintiffs) of numerous fraudulent documents in an ongoing scheme, the Count I Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

537. The activities alleged in this case had the direct effect of causing funds to be transferred from the Plaintiffs to Level 1 Physical Therapy for the benefit of the Count I Defendants.

538. The Count I Defendants participated in the conduct of the Level 1 Physical Therapy enterprise through a pattern of racketeering activities.

539. The Plaintiffs are in the business of writing insurance and paying claims in the State of Michigan. Insurance fraud scheme practiced here and elsewhere have

a deleterious impact on the Plaintiffs' overall financial well-being and adversely affect insurance rates.

540.   Level 1 Physical Therapy constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

541.   The Count I Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of the Level 1 Physical Therapy enterprise through a pattern of racketeering activities.

542.   The Count I Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of the Plaintiffs' injuries.

543.   By virtue of the Count I Defendants' violations of 18 U.S.C. 1962(c), the Plaintiffs are entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Level 1 Health Systems of Michigan, LLC Enterprise)
### Against Sabah Dehko, Select Medical Group of Michigan PLLC d/b/a Select Medical Group of Michigan, PLLC, Pedro Toweh, M.D., Norman Dehko, Dehko Investment, Inc. d/b/a Rent A Ride of Detroit, Somerset Auto Body of MI, Inc., and Lincoln International LLC/1-800-PAIN-800

544.   The Plaintiffs re-allege, re-plead, and incorporate by reference paragraphs 1 through 525 set forth above as if fully set forth herein.

545.   Throughout their participation in Level 1 Physical Therapy Medical

Services, P.C. ("Level 1 Physical Therapy"), Defendants, Sabah Dehko, Select Medical Group of Michigan PLLC d/b/a Select Medical Group of Michigan, PLLC, Pedro Toweh, M.D., Norman Dehko, Dehko Investment, Inc. d/b/a Rent A Ride of Detroit, Somerset Auto Body of MI, Inc., and Lincoln International LLC/1-800-PAIN-800 (collectively, "Count II Defendants") conspired with each other to violate 18 U.S.C. § 1962(c).

546.   The Count II Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Level 1 Physical Therapy by means of a pattern of racketeering activity, namely using the U.S. Mail to send fraudulent Health Insurance Claim forms and other claim-related documents to the Plaintiffs in connection with No-Fault claims, including, without limitation, the numerous instances of mail fraud set forth in Exhibit 6.

547.   The purpose of the conspiracy was to obtain No-Fault benefit payments from the Plaintiffs on behalf of the Provider Defendants, even though the Provider Defendants, as a result of the Count II Defendants' unlawful conduct, were not eligible to collect such No-Fault benefit payments. The Count II Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation of and mailing of documents and other claim-related materials, including Health Insurance Claim forms, containing misrepresentations.

548.   The Plaintiffs have been injured in its business and property by reason

of this conspiratorial conduct whereas the Plaintiffs have been induced to make No-Fault payments as a result of the Count II Defendants' unlawful conduct described herein.

549.  By virtue of this violation of 18 U.S.C. § 1962(d), the Count II Defendants are jointly and severally liable to the Plaintiffs, and the Plaintiffs are entitled to recover from each of the Count II Defendants three times the damages sustained by reason of the claims submitted by the Provider Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT III
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Michigan First Rehab, LLC Enterprise)
### Against Jordan Dehko, Select Medical Group of Michigan PLLC d/b/a Select Medical Group of Michigan, PLLC, Pedro Toweh, M.D., Norman Dehko, Dehko Investment, Inc. d/b/a Rent A Ride of Detroit, Somerset Auto Body of MI, Inc., and Lincoln International LLC/1-800-PAIN-800

550.  The Plaintiffs re-allege, re-plead, and incorporate by reference paragraphs 1 through 525 set forth above as if fully set forth herein.

551.  In furtherance of their operation Michigan First Rehab, LLC ("Michigan First Rehab"), Defendants, Jordan Dehko, Select Medical Group of Michigan PLLC d/b/a Select Medical Group of Michigan, PLLC, Pedro Toweh, M.D., Norman Dehko, Dehko Investment, Inc. d/b/a Rent A Ride of Detroit, Somerset Auto Body of MI, Inc., and Lincoln International LLC/1-800-PAIN-800

(collectively, "Count III Defendants") intentionally prepared and mailed (or caused to be prepared and mailed) false medical documentation in connection with the Plaintiffs' insurance claims in furtherance of their scheme to defraud.

552.   The Count III Defendants employed two or more mailings to demand and/or receive payment from the Plaintiffs on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 6.

553.   Among other things, Health Insurance Claim forms, physical therapy referrals, medical billing invoices, reports and notes, applications for insurance, and premium checks were routinely delivered to the Plaintiffs through the U.S. Mail.

554.   Policies of insurance were delivered to insureds through the U.S. Mail.

555.   Payments made by the Plaintiffs to the Count III Defendants were delivered through the U.S. Mail.

556.   As documented above, the Count III Defendants repeatedly and intentionally submitted, or caused to be submitted, Health Insurance Claim forms to the Plaintiffs related to services that were purportedly performed by the Provider Defendants for the purpose of collecting payment from the Plaintiffs under the Personal Injury Protection benefits portion of the Plaintiffs' policies and applicable Michigan No-Fault laws.

557.   As a result of, and in reasonable reliance upon, the mailing of these materially false representations, the Plaintiffs, by their agents and employees, issued

drafts to the Provider Defendants, for the benefit of one or more of the Count III Defendants, that would not otherwise have been paid.

558.   The Count III Defendants' pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents, each appearing legitimate on their face, also prevented the Plaintiffs from discovering this scheme for a long period of time, thus enabling the Count III Defendants to continue without being detected.

559.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

560.   By creating and then mailing to the Plaintiffs (or directing the creation and subsequent mailing to the Plaintiffs) of numerous fraudulent documents in an ongoing scheme, the Count III Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

561.   The activities alleged in this case had the direct effect of causing funds to be transferred from the Plaintiffs to Michigan First Rehab for the benefit of the Count III Defendants.

562.   The Count III Defendants participated in the conduct of the Michigan First Rehab enterprise through a pattern of racketeering activities.

563.   The Plaintiffs are in the business of writing insurance and paying claims in the State of Michigan. Insurance fraud scheme practiced here and elsewhere have

a deleterious impact on the Plaintiffs' overall financial well-being and adversely affect insurance rates.

564.   Michigan First Rehab constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

565.   The Count III Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of the Michigan First Rehab enterprise through a pattern of racketeering activities.

566.   The Count III Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of the Plaintiffs' injuries.

567.   By virtue of the Count III Defendants' violations of 18 U.S.C. 1962(c), the Plaintiffs are entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IV
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Michigan First Rehab, LLC Enterprise)
### Against Jordan Dehko, Select Medical Group of Michigan PLLC d/b/a Select Medical Group of Michigan, PLLC, Pedro Toweh, M.D., Norman Dehko, Dehko Investment, Inc. d/b/a Rent A Ride of Detroit, Somerset Auto Body of MI, Inc., and Lincoln International, LLC/1-800-PAIN-800

568.   The Plaintiffs re-allege, re-plead, and incorporate by reference paragraphs 1 through 525 set forth above as if fully set forth herein.

569.   Throughout their participation in Michigan First Rehab Medical

Services, P.C. ("Michigan First Rehab"), Defendants, Jordan Dehko, Select Medical Group of Michigan PLLC d/b/a Select Medical Group of Michigan, PLLC, Pedro Toweh, M.D., Norman Dehko, Dehko Investment, Inc. d/b/a Rent A Ride of Detroit, Somerset Auto Body of MI, Inc., and Lincoln International LLC/1-800-PAIN-800 (collectively, "Count IV Defendants") conspired with each other to violate 18 U.S.C. § 1962(c).

570. The Count IV Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Michigan First Rehab by means of a pattern of racketeering activity, namely using the U.S. Mail to send fraudulent Health Insurance Claim forms and other claim-related documents to the Plaintiffs in connection with No-Fault claims, including, without limitation, the numerous instances of mail fraud set forth in Exhibit 6.

571. The purpose of the conspiracy was to obtain No-Fault benefit payments from the Plaintiffs on behalf of the Provider Defendants, even though the Provider Defendants, as a result of the Count IV Defendants' unlawful conduct, were not eligible to collect such No-Fault benefit payments. The Count IV Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation of and mailing of documents and other claim-related materials, including Health Insurance Claim forms, containing misrepresentations.

572. The Plaintiffs have been injured in its business and property by reason

of this conspiratorial conduct whereas the Plaintiffs have been induced to make No-Fault payments as a result of the Count IV Defendants' unlawful conduct described herein.

573.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV Defendants are jointly and severally liable to the Plaintiffs, and the Plaintiffs are entitled to recover from each of the Count IV Defendants three times the damages sustained by reason of the claims submitted by the Provider Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT V
### VIOLATION OF 18 U.S.C. § 1962(c)
**(Select Medical Group of Michigan PLLC d/b/a Select Medical Group of Michigan, PLLC Enterprise)**
**Against Pedro Toweh, M.D., Sabah Dehko, Level 1 Health Systems of Michigan, LLC, Jordan Dehko, Michigan First Rehab, LLC, Norman Dehko, Dehko Investment, Inc. d/b/a Rent A Ride of Detroit, Somerset Auto Body of MI, Inc., and Lincoln International LLC/1-800-PAIN-800**

574.   The Plaintiffs re-allege, re-plead, and incorporate by reference paragraphs 1 through 525 set forth above as if fully set forth herein.

575.   In furtherance of their operation Select Medical Group of Michigan PLLC d/b/a Select Medical Group of Michigan, PLLC ("Select Medical Group"), Defendants, Pedro Toweh, M.D., Sabah Dehko, Level 1 Health Systems of Michigan, LLC, Jordan Dehko, Michigan First Rehab, LLC, Norman Dehko, Dehko

Investment, Inc. d/b/a Rent A Ride of Detroit, Somerset Auto Body of MI, Inc., and Lincoln International LLC/1-800-PAIN-800 (collectively, "Count V Defendants") intentionally prepared and mailed (or caused to be prepared and mailed) false medical documentation in connection with the Plaintiffs' insurance claims in furtherance of their scheme to defraud.

576.   The Count V Defendants employed two or more mailings to demand and/or receive payment from the Plaintiffs on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 6.

577.   Among other things, Health Insurance Claim forms, physical therapy referrals, medical billing invoices, reports and notes, applications for insurance, and premium checks were routinely delivered to the Plaintiffs through the U.S. Mail.

578.   Policies of insurance were delivered to insureds through the U.S. Mail.

579.   Payments made by the Plaintiffs to the Count V Defendants were delivered through the U.S. Mail.

580.   As documented above, the Count V Defendants repeatedly and intentionally submitted, or caused to be submitted, Health Insurance Claim forms to the Plaintiffs related to services that were purportedly performed by the Provider Defendants for the purpose of collecting payment from the Plaintiffs under the Personal Injury Protection benefits portion of the Plaintiffs' policies and applicable Michigan No-Fault laws.

581.   As a result of, and in reasonable reliance upon, the mailing of these materially false representations, the Plaintiffs, by their agents and employees, issued drafts to the Provider Defendants, for the benefit of one or more of the Count V Defendants, that would not otherwise have been paid.

582.   The Count V Defendants' pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents, each appearing legitimate on their face, also prevented the Plaintiffs from discovering this scheme for a long period of time, thus enabling the Count V Defendants to continue without being detected.

583.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

584.   By creating and then mailing to the Plaintiffs (or directing the creation and subsequent mailing to the Plaintiffs) of numerous fraudulent documents in an ongoing scheme, the Count V Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

585.   The activities alleged in this case had the direct effect of causing funds to be transferred from the Plaintiffs to Select Medical Group for the benefit of the Count V Defendants.

586.   The Count V Defendants participated in the conduct of the Select Medical Group enterprise through a pattern of racketeering activities.

587.    The Plaintiffs are in the business of writing insurance and paying claims in the State of Michigan. Insurance fraud scheme practiced here and elsewhere have a deleterious impact on the Plaintiffs' overall financial well-being and adversely affect insurance rates.

588.    Select Medical Group constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

589.    The Count V Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of the Select Medical Group enterprise through a pattern of racketeering activities.

590.    The Count V Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of the Plaintiffs' injuries.

591.    By virtue of the Count V Defendants' violations of 18 U.S.C. 1962(c), the Plaintiffs are entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VI
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Select Medical Group of Michigan PLLC d/b/a Select Medical Group of Michigan, PLLC Enterprise)
### Against Pedro Toweh, M.D., Sabah Dehko, Level 1 Health Systems of Michigan, LLC, Jordan Dehko, Michigan First Rehab, LLC, Norman Dehko, Dehko Investment, Inc. d/b/a Rent A Ride of Detroit, Somerset Auto Body of MI, Inc., and Lincoln International LLC/1-800-PAIN-800

592.   The Plaintiffs re-allege, re-plead, and incorporate by reference paragraphs 1 through 525 set forth above as if fully set forth herein.

593.   Throughout their participation in Select Medical Group of Michigan PLLC d/b/a Select Medical Group of Michigan, PLLC ("Select Medical Group"), Defendants, Pedro Toweh, M.D., Sabah Dehko, Level 1 Health Systems of Michigan, LLC, Jordan Dehko, Michigan First Rehab, LLC, Norman Dehko, Dehko Investment, Inc. d/b/a Rent A Ride of Detroit, Somerset Auto Body of MI, Inc., and Lincoln International LLC/1-800-PAIN-800 (collectively, "Count VI Defendants") conspired with each other to violate 18 U.S.C. § 1962(c).

594.   The Count VI Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Select Medical Group by means of a pattern of racketeering activity, namely using the U.S. Mail to send fraudulent Health Insurance Claim forms and other claim-related documents to the Plaintiffs in connection with No-Fault claims, including, without limitation, the numerous instances of mail fraud set forth in Exhibit 6.

595.   The purpose of the conspiracy was to obtain No-Fault benefit payments from the Plaintiffs on behalf of the Provider Defendants, even though the Provider Defendants, as a result of the Count VI Defendants' unlawful conduct, were not eligible to collect such No-Fault benefit payments. The Count VI Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation of and mailing of documents and other claim-related materials, including Health Insurance Claim forms, containing misrepresentations.

596.   The Plaintiffs have injured in its business and property by reason of this conspiratorial conduct whereas the Plaintiffs have been induced to make No-Fault payments as a result of the Count VI Defendants' unlawful conduct described herein.

597.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count VI Defendants are jointly and severally liable to the Plaintiffs, and the Plaintiffs are entitled to recover from each of the Count VI Defendants three times the damages sustained by reason of the claims submitted by the Provider Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

<u>COUNT VII</u>

**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Dehko Investment, Inc. d/b/a Rent A Ride of Detroit Enterprise)**
**Against Norman Dehko, Level 1 Health Systems of Michigan, LLC, Sabah**
**Dehko, Michigan First Rehab, LLC, Jordan Dehko, Select Medical Group**
**of Michigan PLLC d/b/a Select Medical Group of Michigan, PLLC Pedro**
**Toweh, M.D., Somerset Auto Body of MI, Inc., and Lincoln International**
**LLC/1-800-PAIN-800**

598.  The Plaintiffs re-allege, re-plead, and incorporate by reference paragraphs 1 through 525 set forth above as if fully set forth herein.

599.  In furtherance of their operation Dehko Investment, Inc. d/b/a Rent A Ride of Detroit ("Rent A Ride"), Defendants, Norman Dehko, Level 1 Health Systems of Michigan, LLC, Sabah Dehko, Michigan First Rehab, LLC, Jordan Dehko, Select Medical Group of Michigan PLLC d/b/a Select Medical Group of Michigan, PLLC, Pedro Toweh, M.D., Somerset Auto Body of MI, Inc., and Lincoln International LLC/1-800-PAIN-800 (collectively, "Count VII Defendants") intentionally prepared and mailed (or caused to be prepared and mailed) false medical documentation in connection with the Plaintiffs' insurance claims in furtherance of their scheme to defraud.

600.  The Count VII Defendants employed two or more mailings to demand and/or receive payment from the Plaintiffs on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 6.

601. Among other things, transportation invoices, transportation logs, applications for insurance, and premium checks were routinely delivered to the Plaintiffs through the U.S. Mail.

602. Policies of insurance were delivered to insureds through the U.S. Mail.

603. Payments made by the Plaintiffs to the Count VII Defendants were delivered through the U.S. Mail.

604. As documented above, the Count VII Defendants repeatedly and intentionally submitted, or caused to be submitted, invoices to the Plaintiffs related to services that were purportedly performed by the Provider Defendants for the purpose of collecting payment from the Plaintiffs under the Personal Injury Protection benefits portion of the Plaintiffs' policies and applicable Michigan No-Fault laws.

605. As a result of, and in reasonable reliance upon, the mailing of these materially false representations, the Plaintiffs, by their agents and employees, issued drafts to the Provider Defendants, for the benefit of one or more of the Count VII Defendants, that would not otherwise have been paid.

606. The Count VII Defendants' pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents, each appearing legitimate on their face, also prevented the Plaintiffs from discovering this scheme

for a long period of time, thus enabling the Count VII Defendants to continue without being detected.

607.   The facts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

608.   By creating and then mailing to the Plaintiffs (or directing the creation and subsequent mailing to the Plaintiffs) of numerous fraudulent documents in an ongoing scheme, the Count VII Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

609.   The activities alleged in this case had the direct effect of causing funds to be transferred from the Plaintiffs to Rent A Ride for the benefit of the Count VII Defendants.

610.   The Count VII Defendants participated in the conduct of the Rent A Ride enterprise through a pattern of racketeering activities.

611.   The Plaintiffs are in the business of writing insurance and paying claims in the State of Michigan. Insurance fraud scheme practiced here and elsewhere have a deleterious impact on the Plaintiffs' overall financial well-being and adversely affect insurance rates.

612.   Rent A Ride constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

613.    The Count VII Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of the Rent A Ride enterprise through a pattern of racketeering activities.

614.    The Count VII Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of the Plaintiffs' injuries.

615.    By virtue of the Count VII Defendants' violations of 18 U.S.C. 1962(c), the Plaintiffs are entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VIII
### VIOLATION OF 18 U.S.C. § 1962(d)
**(Dehko Investment, Inc. d/b/a Rent A Ride of Detroit Enterprise) Against Norman Dehko, Level 1 Health Systems of Michigan, LLC, Sabah Dehko, Michigan First Rehab, LLC, Jordan Dehko, Select Medical Group of Michigan PLLC d/b/a Select Medical Group of Michigan, PLLC, Pedro Toweh, M.D., Somerset Auto Body of MI, Inc., and Lincoln International LLC/1-800-PAIN-800**

616.    The Plaintiffs re-allege, re-plead, and incorporate by reference paragraphs 1 through 525 set forth above as if fully set forth herein.

617.    Throughout their participation in Dehko Investment, Inc. d/b/a Rent A Ride of Detroit ("Rent A Ride"), Defendants, Norman Dehko, Level 1 Health Systems of Michigan, LLC, Sabah Dehko, Michigan First Rehab, LLC, Jordan Dehko, Select Medical Group of Michigan PLLC d/b/a Select Medical Group of

Michigan, PLLC, Pedro Toweh, M.D., Somerset Auto Body of MI, Inc., and Lincoln International LLC/1-800-PAIN-800 (collectively, "Count VIII Defendants") conspired with each other to violate 18 U.S.C. § 1962(c).

618.  The Count VIII Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Rent A Ride by means of a pattern of racketeering activity, namely using the U.S. Mail to send fraudulent invoices and other claim-related documents to the Plaintiffs in connection with No-Fault claims, including, without limitation, the numerous instances of mail fraud set forth in Exhibit 6.

619.  The purpose of the conspiracy was to obtain No-Fault benefit payments from the Plaintiffs on behalf of the Provider Defendants, even though the Provider Defendants, as a result of the Count VIII Defendants' unlawful conduct, were not eligible to collect such No-Fault benefit payments. The Count VIII Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation of and mailing of documents and other claim-related materials, including invoices, containing misrepresentations.

620.  The Plaintiffs have been injured in its business and property by reason of this conspiratorial conduct whereas the Plaintiffs have been induced to make No-Fault payments as a result of the Count VIII Defendants' unlawful conduct described herein.

621.  By virtue of this violation of 18 U.S.C. § 1962(d), the Count VIII Defendants are jointly and severally liable to the Plaintiffs, and the Plaintiffs are entitled to recover from each of the Count VIII Defendants three times the damages sustained by reason of the claims submitted by the Provider Defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT IX**
**COMMON LAW FRAUD**
**Against All Defendants**

622.  The Plaintiffs re-allege, re-plead, and incorporate by reference paragraphs 1 through 525 set forth above as if fully set forth herein.

623.  The Defendants Level 1 Physical Therapy, Michigan First Rehab, Select Medical Group, Rent A Ride, Somerset Auto, 1-800-PAIN, Sabah Dehko, Jordan Dehko, Norman Dehko, and Toweh ("Count IX Defendants") engaged in a scheme to defraud the Plaintiffs that was dependent upon a succession of material misrepresentations of fact that the Defendants were entitled to collect benefits pursuant to applicable provisions of the Michigan No-Fault Act.

624.  The Count IX Defendants made material misrepresentations of fact related to the tests, treatment, and services that were (1) not rendered; (2) medically unnecessary and pursuant to a predetermined treatment protocol; (3) fraudulently billed; and/or (4) not lawfully rendered, discussed in section III, *supra*.

625.   The Count IX Defendants' representations were false.

626.   The Count IX Defendants intentionally made the material misrepresentations to the Plaintiffs to further this scheme to defraud the Plaintiffs by submitting false medical documentation in support of claims for payment pursuant to applicable provisions of the Michigan No-Fault Act.

627.   The Count IX Defendants knew that the material misrepresentations submitted to the Plaintiffs were, in fact, false.

628.   The Count IX Defendants' misrepresentations were made for the purpose of inducing the Plaintiffs to make payments for claims that are not compensable under Michigan law.

629.   The Plaintiffs reasonably relied upon such material misrepresentations to their detriment in paying numerous false bills pursuant to insurance claims.

630.   As a direct and proximate result of the Defendants' fraudulent representations, the Plaintiffs have been damaged in its business and property as previously described herein.

## COUNT X
## CIVIL CONSPIRACY
### Against All Defendants

631.   The Plaintiffs re-allege, re-plead, and incorporate by reference paragraphs 1 through 525 set forth above as if fully set forth herein.

632.    Defendants Level 1 Physical Therapy, Michigan First Rehab, Select Medical Group, Rent A Ride, Somerset Auto, 1-800-PAIN, Sabah Dehko, Jordan Dehko, Norman Dehko, and Toweh ("Count X Defendants") conspired to defraud the Plaintiffs by submitting claims for payment pursuant to applicable provisions of the Michigan No-Fault Act to which they were not entitled because (1) the Defendants did not actually render the treatment for which claims were submitted, (2) the Defendants did not provide reasonably necessary medical treatment, (3) the Defendants did not lawfully render treatment, and (4) the Defendants engaged in fraudulent billing practices.

633.    The Count X Defendants worked together to achieve an unlawful purpose (namely, defrauding the Plaintiffs).

634.    The Count X Defendants intentionally pursued the unlawful purpose for their personal gain, despite knowing that the Defendants were not entitled to payment pursuant to applicable provisions of the Michigan No-Fault Act because they billed for services that (1) were not actually provided, (2) were not reasonably necessary, (3) was not lawfully rendered, and (4) by engaging in fraudulent billing practices.

635.    The Count X Defendants submitted false medical documentation to the Plaintiffs seeking payment.

636.   The Plaintiffs made payments to the Provider Defendants on reasonable reliance on the false medical documentation.

637.   Each of the Count X Defendants directly benefited from the payments made to the Provider Defendants.

638.   Each of the Count X Defendants actively and intentionally engaged in the scheme to defraud the Plaintiffs.

639.   Each of the Count X encouraged and aided other Count X Defendants in the commission of acts done for the benefit of all Count X Defendants and to the unjustified detriment of the Plaintiffs.

640.   Accordingly, all of the Count X Defendants are equally liable for the fraud perpetrated on the Plaintiffs pursuant to their conspiracy.

## COUNT XI
### PAYMENT UNDER MISTAKE OF FACT
**Against Level 1 Health Systems of Michigan, LLC, Michigan First Rehab, LLC, Select Medical Group, PLLC, and Dehko Investment, Inc. d/b/a Rent A Ride of Detroit**

641.  The Plaintiffs re-allege, re-plead, and incorporate by reference paragraphs1 through 525 set forth above as if fully set forth herein.

642.  The Plaintiffs paid the amounts described herein and itemized in Exhibits 7 through 10 under a misunderstanding, misapprehension, error, fault, or ignorance of material facts, namely, the scheme to defraud the Plaintiffs by misrepresenting the fact, lawfulness, and necessity of services purportedly provided

and billed by Level 1 Physical Therapy, Michigan First Rehab, Select Medical Group, and Rent A Ride ("Count XI Defendants").

643.   The Plaintiffs sustained damages by paying under a mistake of fact the claims submitted by the Count XI Defendants, which misrepresented the fact, reasonableness, necessity, and lawfulness of the medical services allegedly rendered and whether the patient's injury arose out of a motor vehicle accident.

644.   The Count XI Defendants, individually and jointly, would be unjustly enriched if permitted to retain the payments made to them by the Plaintiffs under a mistake of fact.

645.   The Plaintiffs are entitled to restitution from each of the Count XI Defendants, individually and jointly, for all monies paid to and/or received by them from the Plaintiffs.

**COUNT XII**
**UNJUST ENRICHMENT**
**Against All Defendants**

646.   The Plaintiffs re-allege, re-plead, and incorporate by reference paragraphs 1 through 525 set forth above as if fully set forth herein.

647.   Defendants Level 1 Physical Therapy, Michigan First Rehab, Select Medical Group, Rent A Ride, Somerset Auto, 1-800-PAIN, Sabah Dehko, Jordan Dehko, Norman Dehko, and Toweh ("Count XII Defendants") submitted, caused to be submitted, or benefited indirectly from claims submitted to the Plaintiffs that

caused the Plaintiffs to pay money, in reasonable belief that they were legally obligated to make such payments based upon the Defendants' fraudulent misrepresentations.

648.   The Plaintiffs' payments constitute a benefit, which the Count XII Defendants aggressively sought and voluntarily accepted.

649.   The Count XII Defendants wrongfully obtained or benefited from payments from the Plaintiffs through the fraudulent scheme detailed herein.

650.   The Count XII Defendants have been unjustly enriched by receipt of or benefit from these wrongfully obtained payments from the Plaintiffs.

651.   The Count XII Defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

## COUNT XIII
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

652.   The Plaintiffs re-allege, re-plead, and incorporate by reference paragraphs 1 through 525 set forth above as if fully set forth herein.

653.   Defendants Level 1 Physical Therapy, Michigan First Rehab, Select Medical Group, Rent A Ride, Somerset Auto, 1-800-PAIN, Sabah Dehko, Jordan Dehko, Norman Dehko, and Toweh ("Count XIII Defendants") routinely billed for unnecessary and unlawful services with respect to the patients at issue in this Complaint.

654.   The Count XIII Defendants also rendered services pursuant to a fraudulent scheme whereby patients were illegally solicited and referred to them for the purpose of generating claims to the Plaintiffs, and not for the purpose of providing reasonably necessary medical treatment, testing, or services.

655.   Pursuant to the Michigan No-Fault Act, an insurer is liable to pay benefits only for reasonable and necessary expenses for lawfully rendered treatment arising out of a motor vehicle accident.   Mich. Comp. Laws §§ 500.3105 and 500.3107.

656.   The lack of reasonableness and necessity are defenses to an insurer's obligation to pay No-Fault benefits arising out of a motor vehicle accident.   Mich. Comp. Laws § 500.3107.

657.   The lack of lawfully-rendered treatment (such as treatment arising from illegal solicitation and unlicensed treatment) is also a defense to an insurer's obligation to pay No-Fault benefits.

658.   Where a provider is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

659.   The Count XIII Defendants continue to submit claims under applicable provisions of the Michigan No-Fault Act for unnecessary and unlawfully rendered

medical services to the Plaintiffs, and other claims remain pending with the Plaintiffs.

660.   The Count XIII Defendants will continue to submit claims under applicable provisions of the Michigan No-Fault Act absent a declaration by this Court that the Plaintiffs have no obligation to pay fraudulent pending and previously-denied insurance claims submitted by any of the Count XIII Defendants for any or all of the reasons set out in the within Complaint.

661.   Accordingly, the Plaintiffs request a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XIII Defendants billed for unnecessary and unlawful treatment that is not compensable under applicable provisions of the Michigan No-Fault Act.

662.   The Plaintiffs also request a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XIII Defendants were engaged in a fraudulent scheme whereby they billed for unnecessary and unlawful treatment and submitted unreasonable charges for the same to the Plaintiffs at all relevant times.

663.   As such, the Count XIII Defendants have no standing to submit, pursue, or receive benefits or any other payment from the Plaintiffs, and the Plaintiffs request a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XIII Defendants cannot seek payment from the Plaintiffs for benefits

under Michigan's No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint.

664.   The Plaintiffs further request a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XIII Defendants cannot balance bill or otherwise seek payment from any person insured under the Plaintiffs' policy or for whom the Plaintiffs are the responsible payors related to the fraudulent conduct detailed in the within Complaint.

## XVIII. **DEMAND FOR RELIEF**

WHEREFORE, Plaintiffs, United Services Automobile Association, USAA General Indemnity Company, and USAA Casualty Insurance Company respectfully pray that judgment enter in their favor as follows:

**COUNT I**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Level 1 Health Systems of Michigan, LLC Enterprise)**
**Against Sabah Dehko, Select Medical Group of Michigan PLLC d/b/a**
**Select Medical Group of Michigan, PLLC, Pedro Toweh, M.D., Norman**
**Dehko, Dehko Investment, Inc. d/b/a Rent A Ride of Detroit, Somerset**
**Auto Body of MI, Inc., and Lincoln International, LLC/1-800-PAIN-800**

(a)   AWARD the Plaintiffs their actual and consequential damages in an amount to be determined at trial;

(b)   AWARD the Plaintiffs treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)   GRANT the Plaintiffs injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)   GRANT all other relief this Court deems just.

## COUNT II
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Level 1 Health Systems of Michigan, LLC Enterprise)**
**Against Sabah Dehko, Select Medical Group of Michigan PLLC d/b/a**
**Select Medical Group of Michigan, PLLC, Pedro Toweh, M.D., Norman**
**Dehko, Dehko Investment, Inc. d/b/a Rent A Ride of Detroit, Somerset**
**Auto Body of MI, Inc., and Lincoln International, LLC/1-800-PAIN-800**

(a)   AWARD the Plaintiffs their actual and consequential damages in an amount to be determined at trial;

(b)   AWARD the Plaintiffs treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)   GRANT the Plaintiffs injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)   GRANT all other relief this Court deems just.

## COUNT III
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Michigan First Rehab, LLC Enterprise)
**Against Jordan Dehko, Select Medical Group of Michigan PLLC d/b/a Select Medical Group of Michigan, PLLC, Pedro Toweh, M.D., Norman Dehko, Dehko Investment, Inc. d/b/a Rent A Ride of Detroit, Somerset Auto Body of MI, Inc., and Lincoln International, LLC/1-800-PAIN-800**

(a) AWARD the Plaintiffs their actual and consequential damages in an amount to be determined at trial;

(b) AWARD the Plaintiffs treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c) GRANT the Plaintiffs injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d) GRANT all other relief this Court deems just.

## COUNT IV
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Michigan First Rehab, LLC Enterprise)
**Against Jordan Dehko, Select Medical Group of Michigan PLLC d/b/a Select Medical Group of Michigan, PLLC, Pedro Toweh, M.D., Norman Dehko, Dehko Investment, Inc. d/b/a Rent A Ride of Detroit, Somerset Auto Body of MI, Inc., and Lincoln International, LLC/1-800-PAIN-800**

(a) AWARD the Plaintiffs their actual and consequential damages in an amount to be determined at trial;

(b) AWARD the Plaintiffs treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)   GRANT the Plaintiffs injunctive relief enjoining the Defendants from

engaging in the wrongful conduct alleged in the within Complaint; and

(d)   GRANT all other relief this Court deems just.

## COUNT V
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Select Medical Group of Michigan PLLC d/b/a Select Medical Group of Michigan, PLLC Enterprise)
### Against Pedro Toweh, M.D., Sabah Dehko, Level 1 Health Systems of Michigan, LLC, Jordan Dehko, Michigan First Rehab, LLC, Norman Dehko, Dehko Investment, Inc. d/b/a Rent A Ride of Detroit, Somerset Auto Body of MI, Inc., and Lincoln International LLC/1-800-PAIN-800

(a)   AWARD the Plaintiffs their actual and consequential damages in an

amount to be determined at trial;

(b)   AWARD the Plaintiffs treble damages pursuant to 18 U.S.C. § 1964,

together with interest, costs, and attorney's fees;

(c)   GRANT the Plaintiffs injunctive relief enjoining the Defendants from

engaging in the wrongful conduct alleged in the within Complaint; and

(d)   GRANT all other relief this Court deems just.

152

## COUNT VI
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Select Medical Group of Michigan PLLC d/b/a Select Medical Group of Michigan, PLLC Enterprise)
### Against Pedro Toweh, M.D., Sabah Dehko, Level 1 Health Systems of Michigan, LLC, Jordan Dehko, Michigan First Rehab, LLC, Norman Dehko, Dehko Investment, Inc. d/b/a Rent A Ride of Detroit, Somerset Auto Body of MI, Inc., and Lincoln International LLC/1-800-PAIN-800

(a)   AWARD the Plaintiffs their actual and consequential damages in an amount to be determined at trial;

(b)   AWARD the Plaintiffs treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)   GRANT the Plaintiffs injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)   GRANT all other relief this Court deems just.

## COUNT VII
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Dehko Investment, Inc. d/b/a Rent A Ride of Detroit Enterprise)
### Against Norman Dehko, Level 1 Health Systems of Michigan, LLC, Sabah Dehko, Michigan First Rehab, LLC, Jordan Dehko, Select Medical Group of Michigan PLLC d/b/a Select Medical Group of Michigan, PLLC, Pedro Toweh, M.D., Somerset Auto Body of MI, Inc., and Lincoln International LLC/1-800-PAIN-800

(a)   AWARD the Plaintiffs their actual and consequential damages in an amount to be determined at trial;

153

(b)   AWARD the Plaintiffs treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)   GRANT the Plaintiffs injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)   GRANT all other relief this Court deems just.

**COUNT VIII**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Dehko Investment, Inc. d/b/a Rent A Ride of Detroit Enterprise)**
**Against Norman Dehko, Level 1 Health Systems of Michigan, LLC, Sabah Dehko, Michigan First Rehab, LLC, Jordan Dehko, Select Medical Group of Michigan PLLC d/b/a Select Medical Group of Michigan, PLLC, Pedro Toweh, M.D., Somerset Auto Body of MI, Inc., and Lincoln International LLC/1-800-PAIN-800**

(a)   AWARD the Plaintiffs their actual and consequential damages in an amount to be determined at trial;

(b)   AWARD the Plaintiffs treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)   GRANT the Plaintiffs injunctive relief enjoining the Defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)   GRANT all other relief this Court deems just.

## COUNT IX
**COMMON LAW FRAUD**
**Against All Defendants**

(a)   AWARD the Plaintiffs their actual and consequential damages against the Defendants jointly and severally in an amount to be determined at trial;

(b)   AWARD the Plaintiffs its costs, including, but not limited to, investigative costs incurred in the detection of the Defendants' illegal conduct; and

(c)   GRANT all other relief this Court deems just.

## COUNT X
**CIVIL CONSPIRACY**
**Against All Defendants**

(a)   AWARD the Plaintiffs their actual and consequential damages against the Defendants jointly and severally in an amount to be determined at trial;

(b)   AWARD the Plaintiffs its costs, including, but not limited to, investigative costs incurred in the detection of the Defendants' illegal conduct; and

(c)   GRANT all other relief this Court deems just.

## COUNT XI
**PAYMENT UNDER MISTAKE OF FACT**
**Against Level 1 Health Systems of Michigan, LLC, Michigan First Rehab, LLC, Select Medical Group, PLLC, and Dehko Investment, Inc. d/b/a Rent a Ride of Detroit**

(a)    AWARD the Plaintiffs their actual and consequential damages in an amount to be determined at trial; and

(b)    GRANT all other relief this Court deems just.

## COUNT XII
**UNJUST ENRICHMENT**
**Against All Defendants**

(a)    AWARD the Plaintiffs their actual and consequential damages in an amount to be determined at trial; and

(b)    GRANT all other relief this Court deems just.

## COUNT XIII
**DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201**
**Against All Defendants**

(a)    DECLARE that the Plaintiffs have no obligation to pay pending and previously-denied insurance claims submitted by Level 1 Health Systems of Michigan, LLC, Michigan First Rehab, LLC, Select Medical Group of Michigan PLLC d/b/a Select Medical Group of Michigan, PLLC, Dehko Investment, Inc. d/b/a Rent A Ride of Detroit, Somerset Auto Body of MI, Inc., Lincoln International LLC/1-800-PAIN-800, Sabah Dehko, Jordan Dehko, Norman Dehko,

and Pedro Toweh, M.D. for any or all of the reasons set out in the within Complaint;

(b)  DECLARE that Level 1 Health Systems of Michigan, LLC, Michigan First Rehab, LLC, Select Medical Group of Michigan PLLC d/b/a Select Medical Group of Michigan, PLLC, Dehko Investment, Inc. d/b/a Rent A Ride of Detroit, Somerset Auto Body of MI, Inc., Lincoln International LLC/1-800-PAIN-800, Sabah Dehko, Jordan Dehko, Norman Dehko, and Pedro Toweh, M.D., jointly and severally, cannot seek payment from the Plaintiffs pursuant to the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint;

(c)  DECLARE that Level 1 Health Systems of Michigan, LLC, Michigan First Rehab, LLC, Select Medical Group of Michigan PLLC d/b/a Select Medical Group of Michigan, PLLC, Dehko Investment, Inc. d/b/a Rent A Ride of Detroit, Somerset Auto Body of MI, Inc., Lincoln International LLC/1-800-PAIN-800, Sabah Dehko, Jordan Dehko, Norman Dehko, and Pedro Toweh, M.D., jointly and severally, cannot balance bill or otherwise seek payment from any person insured under a the Plaintiffs' policy or for whom the Plaintiffs are the responsible payors related to the fraudulent conduct detailed in the within Complaint; and

(d)　　GRANT such other relief as this Court deems just and appropriate under Michigan law and the principles of equity.

## XIX.　**DEMAND FOR JURY TRIAL**

The Plaintiffs hereby demand a trial by jury on all claims.

KING, TILDEN, MCETTRICK & BRINK, P.C.

*/s/ Nathan A. Tilden*

_____

Nathan A. Tilden (P76969)
ntilden@ktmpc.com
Hugh C. M. Brady
hbrady@ktmpc.com
Andrew T. Apjohn
aapjohn@ktmpc.com
38777 Six Mile Road, Suite 314
Livonia, MI 48152
(734) 521-9000

350 Granite Street, Suite 2204
Braintree, MA 02184
(617) 770-2214

Attorneys for the Plaintiffs,
*United Services Automobile Association,*
*USAA General Indemnity Company, and*
*USAA Casualty Insurance Company*

Dated: January 3, 2025